```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
M.K.B., O.P., L.W., M.A., MARIEME     :
DIONGUE, M.E., P.E., ANNA FEDOSENKO,  :
A.I., L.A.M., L.M., DENISE THOMAS,    :
and J.Z., on their own behalf, and on :
behalf of their minor children and    :
all others similar situated,          :
                                      :
              Plaintiffs,             :     05 Civ. 10446 (JSR)
                                      :
              -v-                     :     OPINION AND ORDER
                                      :
VERNA EGGLESTON, as Commissioner of   :
the New York City Human Resources     :
Administration; ROBERT DOAR, as       :
Commissioner of the New York State    :
Office of Temporary and Disability    :
Assistance; and ANTONIA C. NOVELLO,   :
as Commissioner of the New York State :
Department of Health,                 :
                                      :
              Defendants.             :
------------------------------------ x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-29-06

JED S. RAKOFF, U.S.D.J.

It is not the policy of the United States, nor of the State of New York, to leave destitute the battered immigrant wives and children of lawful U.S. residents just because their abusive husbands are no longer supporting them or providing them with a basis for obtaining aid. But this case, at least as it has proceeded thus far, suggests that just such dire consequences are occurring with respect to these and certain other immigrant groups who, because of bureaucratic customs and usages, have fallen between the cracks of New York's welfare system.

This proposed class action, brought principally under 42 U.S.C. § 1983, alleges that defendant Verna Eggleston (the "City Defendant"), sued in her official capacity as Commissioner of the New York City Human Resources Administration ("HRA"), and defendants Robert Doar and Antonia C. Novello (the "State Defendants"), sued in their official capacities

as, respectively, Commissioner of the New York State Office of Temporary and Disability Assistance ("OTDA") and Commissioner of the New York State Department of Health ("DOH"), have a policy, custom, or usage of denying federal benefits and providing inadequate notice of eligibility determinations to eligible battered qualified aliens and their children, as well as to certain lawful permanent residents who have been in that status for less than five years, all in violation of plaintiffs' federal statutory and constitutional rights.  Plaintiffs also assert pendent state law claims against the City Defendant, alleging that HRA has unlawfully denied state benefits not only to eligible battered qualified aliens and individuals who have been lawful permanent residents for less than five years, but also to aliens who are permanently residing in the United States under color of law, known as "PRUCOL" aliens (for "permanently residing under color of law").

Plaintiffs have moved for preliminary injunctive relief and for class certification.  By Order dated February 16, 2006, the Court held that plaintiffs were likely to prevail against various legal defenses asserted by defendants and entered a partial preliminary injunction where the relevant material facts were substantially undisputed.  The Court thereafter conducted a nine day evidentiary hearing to further assess the factual basis for these initial determinations and to determine whether additional preliminary injunctive relief and/or class certification were warranted.  This Opinion and Order sets forth the Court's findings of fact and conclusions of law in further support of the preliminary injunctive relief granted by the February 16 Order, the

further preliminary injunctive relief granted herein, and the Court's determinations with respect to class certification.

By way of background, federal law establishes certain food stamp, health care, and public assistance programs that are federally-funded, in whole or in part, but are state-administered. See 7 U.S.C. § 2011 et seq. (food stamps); 42 U.S.C. § 1396 et seq. (Medicaid); 42 U.S.C. § 601 et seq. (Temporary Assistance for Needy Families). States may directly administer these programs or may delegate the administration to agencies of local government, subject to state supervision. See 42 U.S.C. § 1396a(a)(5); 42 U.S.C. § 602(a)(4); 7 U.S.C. § 2012(n)(1).

Some but not all aliens resident in the United States qualify for assistance under some or all of these programs. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (1996), divides aliens into two categories: qualified aliens and non-qualified aliens, see 8 U.S.C. § 1641. An otherwise qualified alien is eligible for federal Medicaid and federal Temporary Assistance benefits if she entered the United States before August 22, 1996 or has been in a qualified alien status for five or more years, 8 U.S.C. §§ 1612(b)(1), 1613(a), or if she is exempted from the five year residency requirement by § 1613(b), (d). Even if ineligible for federal Medicaid and federal Temporary Assistance, however, qualified aliens are eligible for State-funded Medicaid and Safety Net Assistance. N.Y. Soc. Serv. Law §§ 158(1)(g), 122(b), 366(1)(a). Furthermore, a qualified alien is eligible for food stamps if, inter alia, she has resided in the United States in a qualified alien status

-3-

for five or more years, 8 U.S.C. § 1612(a)(2)(L), or is under 18 years
of age, 8 U.S.C. § 1612(a)(2)(J).

   While some non-qualified aliens are not eligible for any
benefits, one exception is the group known as "PRUCOL aliens," i.e.,
aliens living in the United States with the knowledge and permission or
acquiescence of the federal immigration authorities and whose departure
the federal immigration authorities do not contemplate enforcing.  See
Lewis v. Thompson, 252 F.3d 567, 571-72 (2d Cir. 2001).  For example,
PRUCOL status is frequently accorded to applicants for so-called "V"
visas, which are available to victims of crimes — including crimes of
domestic violence — who have cooperated in the investigation or
prosecution of those crimes.  PRUCOL aliens, although ineligible for
many federal benefits, see 8 U.S.C. § 1611(a), may nonetheless qualify
in New York for state-funded Medicaid and Safety Net Assistance, see
N.Y. Soc. Serv. Law §§ 158(1)(g), 122(c), 366(1)(a).

   Among qualified aliens, two groups that are the primary foci of
much of this case are those battered spouses (or children) who have
filed their own petitions for lawful immigrant status and those for whom
immigration petitions were initially filed by their lawfully resident
or citizen spouses (or parents) by whom they have now been battered and
from whom they have now frequently separated.  In both situations, the
battered person was originally permitted residence here because she was
married to (or the child of) a lawful resident or citizen.  If that
lawful resident filed a petition (known as an "I-130" petition) to
obtain lawful residence on behalf of the alien spouse (or child), but
the alien spouse (or child) subsequently was the subject of domestic

-4-

violence, then the battered alien, upon presenting proof of domestic violence and proof that the I-130 had been filed on her behalf, would become a qualified alien eligible for benefits.  See 8 U.S.C. § 1641(c)(1)(B)(iv).   Alternatively, the battered alien could "self-petition" for lawful status under the Violence Against Women Act ("VAWA") — a petition known as an "I-360" or a "VAWA self-petition" — and, upon receiving a notice either that she had made out a prima facie case for eligibility (a "prima facie notice") or that her petition had been approved, would become eligible for benefits.  See 8 U.S.C. § 1641(c)(1)(B)(i) and (ii).

Finally, one other group that may under certain conditions qualify for benefits are certain lawful residents who, even though in that status for less than five years, meet alternative qualifications for eligibility.  For example, victims of human trafficking can apply for a so-called "T visa" that exempts them from the five-year requirement.  See 8 U.S.C. 1101(a)(15)(T).

### FINDINGS OF FACT

The Court makes the following findings of fact based on the evidence of record, reasonable inferences drawn therefrom, assessment of credibility and demeanor, and resolution of conflicts in the evidence.  Exhibit and testimonial references cited below indicate some but not necessarily all of the direct evidence pertaining to a given

-5-

finding.[1]  Certain additional findings of fact are also made, where appropriate, in the subsequent section on Conclusions of Law.

New York State has elected to delegate the administration of public benefits program to agencies of local government under the supervision of state agencies.  New York is divided into 58 local social services district, with the City of New York constituting one such district.  Tr. 643: 6-16; see also N.Y. Soc. Serv. Law §§ 56, 61.  HRA is the agency responsible for administering these public assistance programs for residents of New York City.

In New York State, DOH supervises the provision of federal and state Medicaid, and OTDA supervises the administration of the Family Assistance, Safety Net Assistance, and Food Stamp programs.  The State Defendants' supervision of the City Defendant consists, in relevant part, of OTDA's policy directives and instructions issued to HRA, OTDA's regular meetings and communications with HRA staff (including availability for on-call assistance), the State's conduct of the "fair hearing" system of appeals from HRA determinations, the State Defendants' computerized Welfare Management System ("WMS"), and the State's occasional training of HRA staff.  Also, HRA may not issue policy directives or policy bulletins without the approval of OTDA.  Tr. 728:7-10.

HRA maintains offices known as Job Centers, where applications for cash assistance, Medicaid and food stamps are processed.  Tr.

---

[1] "Tr." refers to the transcript of the preliminary injunction hearing.  "Pl. Ex.," "City Def. Ex.," and "State Def. Ex." refer to the respective parties' exhibits received at that hearing.  "Decl." refers to sworn declarations that were received in connection with that hearing.

726:11-25.  To train frontline workers at the Job Centers, HRA uses a system called "training the trainers," whereby senior trainers develop curricula and train "center based trainers," who then train, in turn, the staff at their respective Job Centers.  Tr. 1194:6-1195:18; 1204:3-10; 1247: 2-1248:7; City Def. Ex. HHHH at C15784-C15787.  HRA conducts basic training of new hires, Tr. 1279:14-18, and all staff in the Job Centers receive updated training every month, Tr. 1308: 10-25, including training on any new policies or procedures put in place during the previous month, Tr. 974:12-975:9.  In addition, a topic is selected each month for "refresher" training, known as "Back to Basics."  Tr. 1279:19-24.  Finally, workers who need special training on a particular subject are given "elbow training." Tr. 1310:1-3.

At least some HRA training has been conducted in the past on a number of the specific issues raised by this litigation, including training on alien eligibility for public benefits, PRUCOL status, relevance of Social Security numbers, use of WMS and of the City's computerized Paperless Office System ("POS"), notice to be provided to clients, and handling of lost or expired documentation.  Tr. 1273:1-1285:5.  As described below, however, that training has been woefully inadequate.

In 2000, HRA established its Office of Refugee and Immigrant Affairs ("ORIA").  ORIA serves as a resource within HRA for caseworkers, advocates, and other people who have questions relating to the intersection of immigration law and public benefits.  Tr. 909:16-20. In June 2003, Elaine Witty became Director of ORIA.  Tr. 907:23-909:13.

-7-

Ms. Witty established a pilot advocacy program within ORIA for battered immigrants.   Tr. 911:18-25.   In response to this Court's Order of February 16, 2006, HRA established a procedure intended to ameliorate the erroneous denial of benefits to battered qualified aliens and to eligible PRUCOL aliens.   Tr. 1227:1-11; City Ex. LLL.   Under this procedure, if an HRA worker determines that an applicant or recipient is a PRUCOL alien or is the battered spouse of a lawful permanent resident or citizen, then that person should be referred to an immigrant liaison, who receives special training on how to handle those types of cases. Tr. 1228:16-1229:8.   As of the time of the submission of the instant motions, however, HRA had not yet decided what part of a case, outside of the initial eligibility determination, these immigrant liaisons would handle.   For example, it is unclear whether immigrant liaisons will handle recertifications of aliens for benefits.

In the past, the Court finds, battered qualified aliens were unlawfully denied benefits by HRA.   Partly this was because HRA employees failed to understand what was the appropriate documentation to qualify for such eligibility.   For example, with respect to VAWA self-petitions, eligibility under the law could be shown by presenting a notice from the immigration authorities indicating that an I-360 petition had been filed that presented a prima facie case of eligibility (a "prima facie notice") or by presenting evidence (in any of several forms) that the I-360 petition had been approved.   But in numerous cases, HRA workers rejected valid applications for benefits by eligible VAWA self-petitioners because they thought that only a prima facie notice would suffice and/or because they thought that other

-8-

documentation beyond the I-360 petition was required, such as a Social Security number, or a work authorization "green card," or the like. This was true, for example, in the cases of P.E., J.Z., A.M., Denise Thomas, N.M., N.E., W.J., Nicole Prince, M.T. and M.H..[2]

As to P.E., in March 2005 and June 2005 employees at the Riverview and Linden Job Centers erroneously discontinued benefits for P.E., who had an approved VAWA self-petition, and her immigrant son. A March 2005 case note explaining the decision reads "casehead and child are non-residential aliens and do not have social security numbers." Pl. Ex. 244.  In June 2005, P.E. met with an HRA worker at the Linden Job Center, who wrongly told P.E. that she and her son were ineligible for public benefits because she did not have a Social Security number. The June 2005 case note states "No legal status nor Refugee (no social security number, no green card)."  Pl. Ex. 244 at C12209.  Violeta Petrova, a legal intern with Legal Aid, testified that in July 2005 in connection with P.E.'s case, Josephine Pierre, a supervisor at the Linden Job Center, erroneously told Petrova that P.E., who Ms. Pierre knew had an approved VAWA self-petition, nonetheless needed a prima facie notice.  Tr. 1041:16-1042:3.

As to J.Z., in the summer of 2005 Ms. Scantlebury, an HRA employee at the Hamilton Job Center, told J.Z. that she was ineligible for public benefits because her prima facie notice was about to expire. Tr. 214:2-5.  J.Z. then furnished her approval notice for an I-360 self-petition, and was wrongly told that the approval notice was irrelevant

---

[2] On consent, the names of some of the victims of domestic violence are referred to only by initials, in order to protect the victims' safety and privacy.

to her immigration status and eligibility for benefits. Tr.
214:25-215:3. Mr. Sosa, another worker at the same Center, wrongly told
J.Z. that she needed a new prima facie notice. Tr. 215:15-16.
Additionally, in January 2006, an HRA employee at the Riverview Job
Center who was shown J.Z.'s VAWA approval notice wrongly told her that
she was ineligible for public benefits because she did not have a green
card and a social security number. Tr. 215:15-16 .

As to A.M., in February 2005 four different HRA employees at the
Queens Job Center, including a frontline eligibility worker, a
supervisor, and two deputy directors, told Megan Dorton, an intern at
the Battered Women's Rights Clinic who accompanied A.M. to the job
center, that they were unfamiliar with VAWA self-petitions. As a
result, they failed to recognize that, under the circumstances, A.M.'s
VAWA prima facie notice qualified her for public benefits. Tr.
532:21-533:14;  534:10-15;  536:8-23;  539:6-14.   The supervisor
misleadingly suggested that A.M. might be able to achieve eligibility
for public benefits if she applied to USCIS for trafficking documents.
Tr. 534:317-22.

As to Denise Thomas, in September 2004 and again in January 2005
Ms. Thomas presented a VAWA prima facie notice to employees at the
Greenwood Job Center and was erroneously told that she was ineligible
for public benefits. Thomas Decl. ¶¶ 18-19. One caseworker wrongly
told Ms. Thomas that she needed a Social Security number or a green card
in order to be eligible for benefits. Id. ¶ 18. Another caseworker
wrongly told Ms. Thomas that she needed to be a citizen for five years
to be eligible for benefits. Id. ¶ 19.

As to N.M., in the summer of 2005 Ms. Shulzberg, an HRA employee at the Coney Island Job Center, wrongly told N.M. that her VAWA self-petition approval notice did not entitle her to public benefits and tried to turn her away without taking an application from her.   Tr. 1053:1-19.

As to N.E., in October 2004, December 2004, and March 2005, HRA employees at the Euclid Job Center erroneously told N.E. that the notice she presented that her VAWA self-petition had been approved did not confer eligibility for public benefits.   In October 2004, Ms. Gibbs, an HRA worker, wrongly told N.E. that she needed a Social Security number to be eligible for benefits.   N.E. Decl. ¶ 12. In March 2005, another HRA worker wrongly told N.E. that even though a VAWA prima facie notice would qualify her for benefits, the notice approving her petition did not.   Id. ¶ 24.

As to W.J., in June 2003, after W.J. provided her VAWA prima facie notice to HRA, an HRA employee at the Greenwood Job Center erroneously rejected W.J.'s request to be added to added to her daughters' public benefits case, using a code that indicates a finding of ineligibility because of alien status.   Pl. Ex. 996 at MKB11568. Although W.J., with the help of an attorney and a favorable fair hearing decision was thereafter able to reverse this decision, she only received benefits for a short time, as an HRA employee at the Greenwood Center wrongly told her she was ineligible because she did not have a green card and terminated her benefits in April 2004.   W.J. Decl. ¶ 24.

As to Nicole Prince, in February 2005 Ms. Prince presented her VAWA prima facie notice to Ms. Bent, an HRA employee at the Linden Job

Center.  Ms. Bent told Ms. Prince that she had never seen a prima facie notice before and did not know how to handle Ms. Prince's request to be added to her child's public benefits case because Ms. Prince did not have a Social Security number.  Prince Decl. ¶ 12.  After the case was transferred to the Riverview Center, Ms. Prince was wrongly told in March 2005 by Ms. Torres, an HRA employee at Riverview, that she could not be added to her child's case because she did not have a Social Security number.  Id. ¶ 18-19, 22; Pl. Ex. 805; see also Pl. Ex. 808. In April 2005, Ms. Mustrafa, a supervisor at Riverview, wrongly told Ms. Prince that she was not eligible for public assistance or food stamps because she had not been a qualified alien for at least five years. Prince Decl. ¶ 25; Pl. Ex. 816.

As to M.T., in January 2003 M.T. presented a VAWA prima facie notice, but an HRA employee at the Hamilton Job Center erroneously refused to add her to her children's public benefits case.  M.T. Decl. ¶ 14.  Thereafter, even after she was finally added to the case, HRA employees repeatedly and erroneously tried to remove her from the budget because she did not have a Social Security number.  M.T. Decl. ¶¶ 20-22.

As to M.H., she was not added to her daughter's public benefits case until January 2005, four months after she had presented her VAWA prima facie notice and asked to be added.  Pl. Ex. 592 at C11788; M.H. Decl. ¶ 9.  Then, just two weeks after she was added, an HRA employee at the Euclid Job Center wrongly removed her from the case because she had "failed to provide citizenship verification."  Pl. Ex. 592 at C11788; M.H. Decl. ¶ 9.

-12-

Another group of wrongful denials occurred in the case of I-130 petitioners.   HRA employees frequently failed to understand that applicants who presented proof of domestic violence and an approved or pending I-130 petition thereby established eligibility for public benefits.   Rather, the workers either were unfamiliar with I-130 altogether, or believed that a "prima facie notice" (which was not even available in I-130 cases) was required, or believed that some other additional documentation was needed.   This led to wrongful denials of benefits in the cases, for example, of A.I., P.E., L.W., J.Z., M.E., M.A., W.J and C.W.S.

As to A.I., in July 2004 A.I. gave Ms. Walker at the Jamaica Job Center so-called "V-1" and "V-3" visas (for herself and her daughter) that demonstrated the filing of I-130 petitions on their behalf.   Tr. 102:2-104:4; Pl. Ex. 5 at 000017-20.   A.I. was wrongly told by Ms. Walker that they were ineligible for benefits because they did not have green cards.   Tr. 105:23-106:1.   Ms. Walker repeated this assertion seven or eight times over the next year when A.I. repeatedly inquired about receiving benefits for herself and her daughter.   Tr. 106:2-19.

As to P.E., in November 2003 P.E. provided proof of her pending I-130 petition and proof of domestic violence to an HRA employee at the Euclid Job Center.   Tr. 276:16-277:2; Pl. Exs. 227, 234, 235.   P.E. was erroneously told that she and her son were ineligible for public benefits because they did not have green cards or Social Security numbers.   Tr. 277:12-19.

As to L.W., in May 2005 L.W. provided a "K-3 visa" (which demonstrates the existence of a pending I-130 petition) and proof of

-13-

domestic violence.  Tr. 556:11-18; Pl. Ex. 76.  By a notice dated May
31, 2005, HRA wrongly denied expedited issuance of food stamps benefits
to L.W. "because of alien status."  Pl. Ex. 76.

As to J.Z., in July 2004 J.Z. provided the receipt notice for
her I-130 petition and proof of domestic violence, but Mr. Gonzalez, an
HRA employee at the Colgate Job Center, erroneously told her that these
documents did not establish her immigration status and that she was
therefore ineligible for public benefits.  Tr. 207:4-7.  In September
2004, Ms. White, another HRA employee at the Colgate Job Center, wrongly
told J.Z., after reviewing the same documents, that she was ineligible
for public benefits because she was not a citizen.  Tr. 209:4-7.

As to M.E., in September 2004 M.E. provided proof of pending
I-130 petitions for herself and her daughter and proof of domestic
violence.  Ms. Gonzalez, an HRA employee at the Hamilton Job Center,
told M.E. that she did not know why she was receiving public assistance
because she did not have a Social Security number or a green card.  Tr.
141:6-142:8.  A case note dated October 27, 2004 documents a reduction
in benefits paid to M.E.'s family because M.E. and her daughter were
perceived, erroneously, to be "not legal residence [sic] and we do not
have proof of legal status."  Pl. Ex. 200.  Later, in June 2005, after
M.E.'s benefits had been restored, Ms. Gonzalez again told M.E. that her
benefits would (wrongly) be discontinued, this time because she did not
have  a  prima  facie  notice.    Tr.  143:24-145:10.    Ms.  Gonzalez
subsequently stated, erroneously, that a prima facie notice was required
under the circumstances.  Tr. 498:9-16.  On or about July 2005, another
HRA employee at the Hamilton Job Center, Mr. Hynes, repeated that error,

-14-

wrongly telling M.E. that she needed a prima facie notice in order to be eligible for benefits. Tr. 145:11-146:14.  In September 2005, after M.E.'s case was transferred to the Bushwick Job Center, Ms. Baptista, an HRA employee at that Center, told M.E. that she did not know why M.E. was getting public assistance, as she did not have a green card or a social security number.  Tr. 147:2-8.  In November or early December 2005, Ms. Wright, the Administrative Assistant to the Director of the Euclid Job Center, which was then handling M.E.'s case and had just reduced her benefits, wrongly stated that if M.E. did not have an immigration status that qualified her for a Social Security number, she was not eligible for public benefits.  Tr. 503:11-504:2.

As to M.A., in November 2005, Ms. Bonilla, an HRA employee at the Crotona Job Center, erroneously told M.A. that she was ineligible for public benefits because she did not have a prima facie notice, even though she had provided her I-130 receipt notice and proof of domestic violence.  Tr. 252:4-253:2; Pl. Ex. 91A.  A few days later, a different HRA employee, Ms. Delone, wrongly told M.A. that she was ineligible for public benefits until she had a green card.  Tr. 254:10-17; Pl. Ex 592 at C11708.

As to W.J., in late 2002 an HRA employee at the Greenwood Job Center wrongly told W.J., who had presented proof of a pending I-130 petition and proof of domestic violence, W.J. Decl. ¶ 12; Pl. Ex. 990, that W.J. and her son were ineligible for public benefits because they did not have Social Security numbers, W.J. Decl. ¶ 16.

As to C.W.S., who had an approved I-130 petition, Ms. Garcia, the Assistant to the Director of the Waverly Job Center, told C.W.S.'s

representative that she (Ms. Garcia) had spoken with Ms. Adeno, the trainer at the welfare center, and that Ms. Adeno had (wrongly) determined that C.W.S. needed a prime facie notice in order to be eligible for benefits.  Tr. 454:20-455:5.

As further explained below, these numerous instances of wrongful denials with respect to battered aliens who were eligible for benefits under either an I-360 or an I-130 approach were likely the result, in material part, of a custom and practice on the part of HRA of failing to adequately train its personnel with respect to the eligibility for benefits of battered qualified aliens.  Furthermore, battered qualified aliens were also unlawfully denied benefits in part because of the content of the City's training materials and policy directives, which often misstated the eligibility requirements for battered qualified aliens.

For example, in discussing battered qualified aliens' eligibility for benefits, HRA's training materials, until recently, totally ignored eligibility of applicants with approved or pending I-130 petitions or with so-called "K" and "V" visas.[3]  Thus, HRA's "April 2005 Monthly Staff Meeting Instructor's Guide" defines a battered qualified alien solely as a person who has "filed a petition showing they are prima facie eligible for LPR status, under the Violence Against Women

_____

[3] A "V" visa, issued pursuant to INA § 101(a)(15)(v), is issued to a lawful permanent resident's spouse ("V-1") or unmarried child ("V-2" or "V-3") for whom an I-130 petition was filed on or before December 21, 2000. See 8 C.F.R. §§ 214.15(a) and (c). A "K" visa, issued pursuant to INA § 101(a)(15)(k) is issued to a spouse ("K-3") or child ("K-4") for whom an I-130 petition was filed for the purpose of allowing family reunification. 8 C.F.R. § 214.2(K)(7).

-16-

Act."  Pl. Ex. 469 at MKB01171-2.  No other battered qualified aliens are mentioned.  Id. at MKB01168-80.  Similarly, HRA's "April 2005 Training Release" defines a battered qualified alien solely as a person who has "filed a petition showing they are prima facie eligible for LPR status, under the Violence Against Women Act."  Pl. Ex. 464 at C12928. No other battered qualified aliens are mentioned.  Id. at C12928-41. And HRA's April and June 2005 "Trainer's Manual" for its "new hires training" poses the question "What is the 'battered alien' provision?" and answers with reference only to battered aliens with approved I-360 petitions and those with a "prima facie case."  Ex. 468 at MKB01166-7. Battered aliens with I-130 petitions or K or V visas are not mentioned. Id..

Similarly, prior to 2002, the City's alien eligibility desk aid, used as a reference by HRA workers, specified an "INS 'Notice of Prima Facie Case'" as the only document that a battered qualified alien could provide to qualify for benefits.  Pl. Ex. 498 at MKB01064.  In 2002, the desk aid added to the list of permissible documentation an I-360 approval notice, Pl. Ex. 500 at MKB01220, but it was not until February 2005 that the desk aid further added to the list of permissible documentation a number of additional documents that are evidence of a pending or approved I-130 or I-360, such as certain "K" and "V" visas and employment authorization cards with certain codes.  Pl. Ex. 515 at MKB01127.   Moreover, the current City desk aid still leaves out documents that some battered qualified immigrants may offer as proof of their status, such as "V-3" visas.  Pl. Ex. 515 at MKB01127.   Also, the "Description of Status" column in the current City desk aid refers only

-17-

to those battered aliens who "obtain[] 'Notice of Prima Facie Case from USCIS' or [are] found prima facie eligible under the Violence Against Women Act (VAWA)." Pl. Ex. 515 at MKB01127. The description column does not reference those with pending or approved I-130 petitions or those with approved I-360 VAWA self-petitions. Id. Likewise, a 2003 policy directive setting forth HRA's domestic violence program requirements discusses only those battered qualified aliens who have been issued a "Notice of Prima Facie Case." Pl. Ex. 507 at MKB01067. No mention is made of battered qualified aliens with VAWA approval notices or I-130 family based petitions. Id.[4]

Another persistent problem exemplified by some of the instances discussed above is that, prior to the filing of this lawsuit, HRA policy memoranda and training materials stated that a Social Security number is required for the receipt of benefits, even though the State's actual policy is that battered qualified aliens do not have to provide a Social Security number. Thus, for example, City Policy Directive 03-11-ELI stated that for non-working aliens "Furnishing a Social Security Number (SSN) is a condition of eligibility for Public Assistance (PA), Food Stamps (FS), and Medical Assistance (MA)." Pl. Ex. 504 at MKB01499.

---

[4] Following the issuance of the Court's Order of February 16, 2006, HRA, on February 28, 2006, issued Policy Bulletin #06-31, titled "Battered Immigrants and Immigrants who are Permanently Residing in the U.S. under Color of Law." This Policy Bulletin describes the immigrant liaison procedure with greater accuracy. City Def. Ex. LLL. Furthermore, after the evidentiary hearing in this case, the City, after receiving approval from OTDA, issued Policy Directive PD 06-24-ELI, titled "Determining Qualified Alien Status for Battered/Abuse Noncitizens and PRUCOL Eligibility." By letter dated August 1, 2006, plaintiffs did not lodge any objections regarding the discussion of the eligibility of battered qualified aliens in PD 06-24-ELI.

The form letter attached to the directive for furnishing to applicants also states that "all applicants and legally responsible relatives must provide a Social Security Number as a condition of eligibility for receipt of temporary assistance."  Pl. Ex. 504 at MKB01505.

A VAWA self-petitioner, however, cannot obtain a Social Security number until her petition is approved, a process that ordinarily takes 14 to 18 months.  Thus, even though the State's actual policy is for VAWA self-petitioners to become eligible for benefits from the time they file their petition, the insistence of HRA employees that aliens furnish Social Security numbers has made it impossible for VAWA self-petitioners to obtain public benefits.  Tr. 661:23-662:8; 646:14-16.

In 2004, Paul Dichian, employed as a Temporary Assistant Specialist 2 at OTDA and, in that capacity, responsible for interpreting policy for local social service districts, Tr. 640:24-641:4, met with his supervisors at OTDA to discuss this problem.  At that meeting, "[t]hey agreed to say that the domestic violence victims should receive benefits and that HRA should stop denying benefits because of their inability to obtain Social Security numbers and they should write a directive to their centers instructing them."  Tr. 664:17-21.  He testified that "they agreed with me that it was an inappropriate denial of benefits and that the controlling regulation was not 351.2 but really should be 369.2."  Tr. 666:19-22.  But in the end, rather than issuing their own written instructions to correct the problem, State officials orally instructed HRA to issue its own directive, reasoning that this is "a city problem."  Tr. 664:24- 665:16.

-19-

The City issued a new Social Security number policy bulletin, Policy Bulletin 04-171-ELI.  Pl. Ex. 639.  Although that policy bulletin acknowledges that battered immigrants with I-130 petitions or VAWA self-petitions may be eligible for benefits even if they are denied a Social Security number until their petitions are approved, the title of the bulletin and the introductory paragraph only refer to those with an "approved prima facie determination."  Id.  Moreover, there is nothing in the bulletin that makes clear an intent to reverse and rescind the pre-existing directive that a Social Security number is a prerequisite to receiving benefits.  Id.; see also Tr. 690:20-691:7.  Mr. Dichian testified that the City directive was seriously flawed and that he would not have approved it if he had seen it.  Tr. 690:11-14.  James Whelan, the Deputy Director of Policy, Procedures and Training, acknowledged that HRA needed to issue a revised policy memorandum on Social Security numbers and to provide additional training to its staff on this issue. Tr. 1246:7-1247:4.

It was only after the issuance of this Court's Order of February 16, 2006, that corrective measures were taken, and even then the new policy directives that were issued were not as explicit as they might have been in identifying the problem that I-360 and I-130 petitioners face in obtaining Social Security numbers and why this should not disqualify them for benefits.  See PB #06-63, attached as Ex. C to Supplemental Declaration of James Whelan ("Supp Whelan Decl."); PD # 06-10-ELI, attached as Ex. B to Supp. Whelan Decl.; and PD #06-15-ELI, attached as Ex. D to Supp. Whelan Decl.  Indeed, even at the time of the evidentiary hearing in this case, Ive Sisco, the HRA's Director of

-20-

Procedures for Public Assistance Medicaid and Food Stamps, who is responsible for drafting policies regarding alien eligibility, Tr. 967:11-15, 968:10-14, testified to her (erroneous) belief that a Social Security number is a requirement "at least at some point" to receive state-funded safety net assistance, Tr. 997:24-998:4.

In addition to the problems caused by inadequate training, manuals, and directives, battered qualified aliens have also partly been unlawfully denied benefits because of flaws in the design of the City's computer system, POS, specifically, the computer program used at HRA Job Centers to determine eligibility for federal and state benefits. Tr. 801:22-803:13. POS presents the HRA worker with a structured set of questions relevant to the applicant's eligibility. Tr. 803:21-804:2. HRA workers interview applicants and input the relevant responses to POS's queries. Tr. 803:1-13. Some of the information entered in POS is then forwarded to the State's WMS computer system. Tr. 751:13-17.

If the worker indicates that an applicant for benefits is not a U.S. citizen or national, POS launches the alien type determination script, which inquires about the applicant's immigration status. Tr. 754:16-21. The script initially asks the worker to choose which "immigrant status option" describes the applicant's immigration status. Id.; Pl. Ex. 579 at C11055. Until June 2006, there was no immigration status option for a battered qualified alien. Moreover, until November 2005, a worker could access the screen used to open a case for a battered qualified alien, Pl. Ex. 579 at C11098, only by choosing Option 9 (parolee for at least one year), Option 11 (legal permanent resident), or Option 12 (conditional entrant) from the first page of the alien type

-21-

determination script (Pl. Ex. 579 at C11055), Tr. 756:21-757:8 — none
of which accurately describes a battered qualified alien.

After selecting any of these options, the worker is presented
with a list of documents that the applicant may present to establish the
chosen immigration status; but the list for each of those statuses does
not include an approved I-360 VAWA self-petition, the establishment of
prima facie eligibility for an I-360 VAWA self-petition, a receipt
notice showing that an I-360 VAWA self-petition is pending, or an I-130
petition in any respect.   Pl. Ex. 579 at C11064, C11068, C11069; Tr.
769:22-770-7, 770:24-771:2.

Furthermore, until mid-March 2006, in order to open a case for
a battered qualified alien in POS, an Alien number had to be entered.
Tr. 1389:9-12; Pl. Ex. 579 at C11082.   If an Alien number was not
entered, the case would error out.  Tr. 865:4-11; Pl. Ex. 579 at C11082.
But not every battered qualified immigrant has an Alien number.   Thus,
for example, two clients of Reena Ganju, formerly a lawyer at Sanctuary
for Families, were denied public benefits, or had their receipt of
public benefits delayed, because they did not have Alien numbers or
because their Alien numbers could not be located.   Tr. 472:9-474:15.
As of January 27, 2006, Michele Shepard, Director of the Design Team for
POS, was unaware of any instructions for how to open a case for a
battered qualified alien who did not have an Alien number.    Tr.
1389:15-19.

POS also did not advise workers that "two suffix cases" cannot
be opened in POS and must be processed directly in WMS.  Tr. 1360:16-18;
Tr. 1094:3-19; see also Tr. 792:14-19.   A case must have two suffixes

-22-

if, <u>inter alia</u>, one person in the family is eligible for state public benefits and another is eligible for federal public benefits.   Tr. 791:20-792:10, 856:25- 857:3.

HRA discovered these problems as a result of a call by a worker to its help desk in 2004.  Tr. 758:6-11.  But HRA did not even partially correct  the  problem  until  November  2005,  a  year  later.   Tr. 762:25-763:5.  During the period after HRA discovered the problem, and before it implemented a partial correction, HRA notified its help desk that workers should be told to open a case for a battered qualified alien by choosing the "legal permanent resident" option.  Tr. 758:6-10, 759:7-12.   But this (rather dubious) "work-around" was not directly communicated to job center workers.  Tr. 769:5-10.

In November 2005, POS was modified to enable workers to reach the "battered qualified alien" screen, Pl. Ex. 579 at C11098, by selecting the "PRUCOL" or "undocumented" options on the first page of the alien type determination script (Pl. Ex. 579 at C11055).   Tr. 764:1-12.  But a battered qualified alien is not a PRUCOL alien  and is not "undocumented."  Furthermore, the PRUCOL flow presented the worker with a list of supporting documents the applicant can provide, but the list did not include an I-360 VAWA self-petition or an I-130 petition. Pl. Ex. 579 at C11075; Tr. 772:1-7.

As a result of these problems, HRA workers were often unable to open a case in POS for a battered qualified alien.  For example, in November 2004, an HRA worker, Ms. Morales, showed Ms. Ganju that POS did not have a category for VAWA self-petitioner. Tr. 395:13-19.  In Summer 2005, another HRA worker, Mr. Gladly, of the Manhattan Immigrant and

-23-

Refugee Center (Center 47), advised Ms. Ganju that although he knew that an applicant was eligible based on an approved VAWA self-petition, he, his colleagues, and his supervisors "could not input her proper immigration status into the computer." Tr. 393:11-394:20.

If, despite such problems, HRA workers manage to reach the "battered qualified alien" screen on POS, Pl. Ex. 579 at C11098, they are presented with a series of additional questions, to which they must answer "yes" or "no." Until June 2006, a worker, to open a case for a battered qualified alien, had to answer "yes" to the question "Has the individual been granted a petition or have a petition pending with the INS that sets forth a 'Prima Facie Case.'" Id.; Tr. 773:17-22.   In actuality, applicants with a pending I-130 do not have any such prima facie notice; but under the law they are nonetheless eligible for benefits.   The screen, however, appears to require either an approved I-130 or a prima facie notice. Pl. Ex. 579 at C11098.   Furthermore, to satisfy POS as to eligibility, the worker had to answer "yes" to the question "Does there appear to be a substantial connection between the battery or extreme cruelty and the need for the benefits sought." Pl. Ex. 579 at C11098.   But until June 2006, POS provided no instructions regarding how a worker should make this determination. Tr. 778:10-25.

In order to achieve what the law actually required, some workers deliberately "miscoded" applicants as citizens or green card holders in order to open their cases.   Mr. Gladly told Ganju that "caseworkers would oftentimes answer questions in a way that may not be truthful but would give [] the outcome that they thought was warranted."   Tr. 395:23-396:4.   Several of the plaintiffs' cases were miscoded: M.A. was

-24-

coded as a citizen ("C") prior to December 29, 2005 when her status was changed to battered alien ("B"), Pl. Ex. 557 at C10832; L.A.M. was also coded as a citizen ("C"); Pl. Ex. 556 at C110817; A.I. and her immigrant daughter were entered incorrectly as conditional entrants, Pl. Ex. 564 at C10028.    But when an application is miscoded, benefits may be discontinued at a later date if the recipient is unable to verify the immigration status wrongly entered into the computer.   Tr. 391:14-25; 396:8-13.  For example, in October 2004, the public assistance benefits for M.E., a plaintiff in this action, and her minor child were going to be discontinued because they had been miscoded in the computer as citizens.   Tr. 398:13-399:13.

HRA had notice of this problem.   On or about June 30, 2005, Ms. Ganju contacted Elaine Witty, Executive Director of HRA's Office of Immigrant and Refugee Affairs, about the case of R.J., a battered qualified immigrant with an I-130 and proof of domestic violence.   Tr. 397:13-24.   Referring to a WMS computer printout for R.J.'s case, Witty stated that R.J. had been coded as a citizen.   Tr. 397:24-398:3.   Ms. Ganju testified that "[Witty] pointed this out and indicated that it was a problem that it may have been done to expedite the entry of this client's immigration status into the computer in response to her request that the center act on this case, but unfortunately the immigration status was not that which the client actually possessed . . . ."  Tr. 398:3-9.[5]

_____

[5] Only in response to this Court's Order of February 16, 2006, was POS modified so that a case could proceed without an Alien number.    Tr. 865:12-16.    Furthermore, as of June 2006 (and seemingly as a result of the evidentiary hearing), POS was further modified so that "Battered (Abused) Spouse and/or Dependent Child

The inadequacies recounted above led not only to wrongful denials of benefits for battered qualified aliens but also to wrongful denials of benefits for PRUCOL aliens, who, as noted above, are eligible for state benefits even though they are non-qualified aliens and

---

of U.S. Citizen or LPR" is included among the listed immigrant status options that appear on the first page of the alien determination script.  See Supplemental Declaration of Michele Shepard, Director of POS Design Team, dated May  5, 2006 ("Supp. Shepard Decl."), at ¶ 2 & Ex. A; see also Policy Bulletin #06-84-SYS: Release Notes for POS Version 10.1.1, attached as Ex. A to Letter from Jane Tobey Momo, Counsel for City Defendant, to the Court, dated July 18, 2006.  If the worker selects this new immigration status option, POS will eventually display a list of acceptable documentation in the Battered Documentation Window. Supp. Shepard Decl. at ¶ 3 & Ex. B.  That list now includes a notice of action showing the approval of an I-360 VAWA self-petition, the establishment of prima facie eligibility for an I-360 VAWA self-petition, or a Receipt Notice showing that an I-360 VAWA self-petition is pending; notice of action showing that an I-130 visa petition is pending or approved; an order of the Executive Office of Immigration Review (EOIR) granting suspension of deportation under Section 244(a)(3) of the Immigration and Nationality Act (INA); an order of the EOIR granting cancellation of removal under Section 240A(b)(2) of the INA; an I-94 annotated (a)(9) or (a)(15); and any other USCIS documentation indicating that the alien has a K or V visa.  Id.  Furthermore, the list includes an option labeled "None of the Above" that workers are directed to choose if the client must return with documentation, has lost her immigration documents, or is a Derived Child covered by the parents' petition.  Id.  After the worker enters the documentation provided by the applicant, the case is referred to the Domestic Violence Liaison ("DVL"), who determines whether the applicant's claim of domestic violence is credible.  Id. at ¶ 4. If the DVL finds the client to be a credible victim of domestic violence, the worker will indicate, in the "Evidence of Battery or Abuse Window," that the "Results of the Special Assessment Appointment" were positive.  Id. & Ex. C.  The worker must then determine whether there is a substantial connection between the abuse and the need for benefits, using the guidance provided in POS, and whether the abused applicant lives apart from the abuser. Id.  If the answers to those two question are "yes," the applicant may then be found eligible for qualified alien status under the Battered Alien criteria if they satisfy all other eligibility requirements (income verification, expense verification, requisite referrals, and other necessary documentation).  Tr. 811:6-813:3.

-26-

therefore ineligible for federal benefits.  There was ample evidence presented to the Court that not only the City's frontline eligibility workers but also the supervisory staff in the Job Centers are often completely unfamiliar with the rules governing the eligibility of PRUCOL aliens for benefits and fail to recognize the immigration documents that demonstrate this status.  For example, HRA employees who were presented documents establishing a PRUCOL immigration status by Marieme Diongue, O.P., L.A.M., Khady Fofana, R.R., Lucia Rios, Christina Rios, Angelica Higinio, and J.R. failed to recognize that these individuals had shown an immigration situation that made them eligible for state benefits.

As to Marieme Diongue, in March 2005, Ms. Swaby, an HRA employee at the Melrose Job Center, to whom Marieme Diongue had given a deferred action notice and a letter from Diongue's attorney explaining the basis for her eligibility, Tr. 23:11-21, 24:10-22, 26:19-24; 64:3-11; Pl. Exs. 39, 40, 41, wrongly advised Ms. Diongue, after consulting with a supervisor, Tr. 28:11-17, 29:3-6, that Ms. Diongue was ineligible for public benefits, Tr. 30:3-6.  Even after Ms. Diongue prevailed at a subsequent fair hearing and HRA was instructed by the State to reconsider her eligibility, Pl. Ex. 43, HRA sent Ms. Diongue a letter erroneously advising her that she was ineligible "due to [her] immigration status which is only temporary and work only," Pl. Ex. 44.

As to O.P., in May 2006 O.P.
showed Ms. Castillo, an HRA employee at the Hamilton Job Center, her birth certificate, passport, deferred action notice, Social Security card, and employment authorization card.  Tr. 353:12-20, 354:20-23; Pl. Exs. 98, 99.  In response, Ms. Castillo wrongly told O.P. that she was

-27-

ineligible for public benefits because she did not have a green card. Tr. 353:12-20, 354:20-23; 355:5-9; Pl. Exs. 98, 99, 592 at C11699. O.P. subsequently received a notice informing her that her application for public benefits was denied because she did not present verification of citizenship or lawful permanent residence.   Tr. 355:10-12; Tr. 355:22-356:1; Pl. Ex. 101. A POS case note, dated May 18, 2005, stated that O.P. was not issued expedited food stamps because she was "illegal." Pl. Ex. 592 at C11699. Subsequently, in August and October 2005, O.P. once again showed HRA employees the same documents, but was wrongly told that she was ineligible because she did not have a green card.   Tr. 358:1-3; Tr. 359:16-25; Pl. Ex. 592 at C11699. A POS case note from August 27, 2005, refers to O.P. as "undocumented." Pl. Ex. 592 at C11723.

As to L.A.M., in the summer of 2005 L.A.M. presented her employment authorization card, which had been coded to indicate deferred action status, to Ms. Kirkendall, an HRA employee at the Linden Job Center.   Pl. Ex. 612; Declaration of L.A.M., dated Nov. 29, 2005 at ¶ 16.  After consulting with her supervisor, Ms. Kirkendall wrongly told L.A.M. that she was ineligible for public benefits because she was not a citizen and did not have a green card or a "prima facie."   L.A.M. Decl. ¶ 17.  In October 2005, three more HRA employees examined L.A.M.'s employment authorization card and wrongly told her that she was ineligible because she was not a citizen or a green card holder.  L.A.M. Decl. ¶¶ 23-24.

As to Khady Fofana, in May 2005 and July 2005 Ms. Fofana provided her employment authorization card and Social Security card to

-28-

Mr. Jean-Pierre, an HRA employee at the Manhattan Immigrant and Refugee Center.  Mr. Jean-Pierre wrongly told Ms. Fofana that she was ineligible for public benefits without a decision from an immigration judge.  Tr. 572:19-573:2; Pl. Exs. 116, 624, 592 at C11738, C11762.  Subsequently, HRA formally, and wrongly, denied her application because she failed to verify her immigration status.  Tr. 572:19-573:2; Pl. Exs. 116, 624, 592 at C11738, C11762.

As to R.R., in the Spring and Summer of 2005 HRA employees at the Dyckman Job Center reviewed R.R.'s notice of deferred action and employment authorization card and wrongly told her that she was ineligible for public benefits.  R.R. Decl. ¶¶ 10, 12, 14.  In May 2005, one of those employees wrongly told R.R. that she was ineligible for benefits because she did not have a green card and had not been a green card holder for five years.  R.R. Decl. ¶ 12.  In August 2005, accompanied by Jami Johnson, a paralegal at Hughes Hubbard & Reed LLP, R.R. returned to Dyckman and gave her employment authorization card to Ms. Santiago, who then said repeatedly (and wrongly) that R.R. was not entitled to benefits.  Tr. 605:1; Pl. Ex. 451A.

As to Lucia Rios, in March 2005 Ms. Rios presented her deferred action notice, passport, Social Security card, and birth certificate to Ms. Atumi, an HRA employee at the Queens Job Center.  Tr. 623:9-12.  Both Ms. Atumi and her supervisor refused to recognize Ms. Rios's deferred action notice, and both wrongly stated that Rios was ineligible for public benefits based on her immigration status.  Tr. 623:9-12, 624:12-16.

-29-

As to Christina Rios, in March 2005 Ms. Rios presented her deferred action notice, birth certificate, Social Security card, and passport to Ms. Harris, an HRA employee at the Queens Job Center. Tr. 626:11-14. Ms. Harris refused to recognize Ms. Rios's deferred action notice and wrongly stated that Rios was ineligible for public benefits based on her immigration status. Tr. 626:15-19. Ms. Harris's supervisor, Ms. Garcia, also erroneously advised Rios that she was ineligible for public benefits based on her immigration status. Tr. 626:20-627:10.

As to Angelica Higinio, in March, April, and May 2005 Ms. Higinio presented her deferred action notice and employment authorization card to HRA employees at the Melrose Job Center. Higinio Decl. ¶ 18-21. Ms. De La Cruz, an HRA employee, and her supervisor both wrongly told Ms. Higinio that she had to be a permanent resident or citizen to be eligible for benefits. Higinio Decl. ¶¶ 18-19. Subsequently, Ms. Abelo and her supervisor, Ms. Charriez, of the Fordham Job Center, reviewed Ms. Higinio's deferred action notice and employment authorization card and wrongly told her that those documents only permitted her to work, not to receive public benefits. Higinio Decl. ¶ 22.

As to J.R., in November 2005, despite HRA's having J.R.'s deferred action notice and employment authorization card in its files, HRA employees erroneously removed her from her family's public benefits case, noting "no legal status in country only work permit." Pl. Ex. 797, 792.

PRUCOL aliens were also unlawfully denied benefits because of the content of HRA's training materials and policy directives, which misstate the eligibility requirements for PRUCOL aliens.

For example, HRA's "April 2005 Monthly Staff Meeting Instructor's Guide" states that only "qualified immigrants" are eligible for Safety Net Assistance (state public assistance) and does not indicate that PRUCOL aliens are also eligible for Safety Net Assistance. Pl. Ex. 469 at MKB01176. Similarly, HRA's "April 2005 Training Release" states that "qualified immigrants" are eligible for Safety Net Assistance, Pl. Ex. 464 at C12932, but does not mention PRUCOL aliens, id. at C12927-41.

Until 2003, HRA's alien eligibility desk aid did not contain a list of immigration statuses that are considered PRUCOL. Compare Pl. Ex. 502 at MKB01489 with Pl. Ex. 505 at MKB01516. Furthermore, OTDA and DOH have different interpretations of who is and is not PRUCOL, Tr. 712:12-13, but HRA's desk aid does not explain these different interpretations, Pl. Ex. 515 at MKB01129-32. Although the current HRA desk aid includes a broad category of individuals eligible for PRUCOL status — "Any other aliens living in the U.S. with knowledge and written permission of the USCIS and whose departure the agency does not contemplate enforcing," Pl. Ex. 515 at MKB01131 — it does not explicitly list certain categories of PRUCOL aliens that DOH considers eligible for Medicaid. Compare Pl. Ex. 515 at MKB01129-32 with Pl. Ex. 539 at attachments B-1, B-2, D-1, D-3. For example, DOH policy is that applicants for adjustment of status whose applications USCIS has accepted as "properly filed" and applicants for asylum status (such as

-31-

Khady Fofana) are PRUCOL aliens and therefore eligible for Medicaid. Pl. Ex. 539 at D-3, but the HRA desk aid does not list these categories, Pl. Ex. 515 at MKB01129-32.

HRA had notice of this problem. In February 2003, an employee in HRA's OIRA Office sent an e-mail to various City and State officials, including Mr. Dichian, stating "that the centers/workers need more specific guidance on PRUCOL eligibility . . . . This office has received a lot of inquiries from the centers and other program areas on the documentation necessary to establish PRUCOL status and eligibility for Safety Net Assistance. We have been unable to find any policy guidance on the required documentation to establish PRUCOL in the context of eligibility for Safety Net Assistance . . . ." City Ex. MM at MKB-OTDA 10236. Mr. Dichian responded in an e-mail by providing a list of immigrants that OTDA considers PRUCOL. Id. at MKB-OTDA 10234-35.[6]

The flaws in City policy bulletins and policy directives previously discussed also apply to PRUCOL aliens. Since PRUCOL aliens are unable to obtain a Social Security number, these erroneous policy directives and training materials result in the denial of public benefits to many persons who are PRUCOL. Notably, HRA Policy Bulletin 04-171-ELI, which was intended to correct problems with an earlier,

---

[6] After the evidentiary hearing in this case, the City, upon receiving approval from OTDA, issued Policy Directive PD 06-24-ELI, titled "Determining Qualified Alien Status for Battered/Abuse Noncitizens and PRUCOL Eligibility." By letter dated August 1, 2006, however, plaintiffs lodged various objections concerning the discussion of PRUCOL eligibility in PD 06-24-ELI, such as that the revised Policy Directive fails to explain DOH and OTDA's different definitions of PRUCOL. To the extent these objections are not mooted by what follows below, they will be considered by the Court as part of the further proceedings in this case.

incorrect instruction that Social Security numbers are required to be eligible for state benefits, says nothing about PRUCOL aliens.  Pl. Ex. 639.  Mr. Dichian acknowledged that it was incorrect to exclude PRUCOL aliens on this basis, Tr. 685:21-686:22; that he knew of no policy reason for distinguishing between PRUCOL aliens and battered qualified aliens in this regard, Tr. 688:6-10; and that he knew of at least one PRUCOL alien (H.G.) who had been adversely affected by this problem, Tr. 687:25-688:2.

PRUCOL aliens were also unlawfully denied benefits because of the flawed design of the City's computer system, POS.  In addition to those flaws previously discussed, POS provides separate lists of documentation that may be presented to establish PRUCOL status for purposes of Medicaid, Pl. Ex. 579 at C11070-74, and public assistance, Pl. Ex. 579 at C11075-79.  But aside from the first document on each list, the lists are identical.  Compare Pl. Ex 579 at C11070 with Pl. Ex. 579 at C11075.  As a result, the POS PRUCOL-Medicaid screen fails to list certain documentation that, under State DOH policy, Pl. Ex. 539, is sufficient to confer eligibility for Medicaid.

In addition to all of the foregoing problems, HRA frequently fails to provide both battered qualified aliens and PRUCOL aliens with written notice when their applications for benefits have been denied, thus frequently leaving them uncertain as to how next to proceed.  This problem was present in the cases of M.A., Nicole Prince, L.A.M., M.H., K.T., and Angela Higinio.

As to M.A., on July 14, 2005 M.A. asked to be added to her child's public assistance case.   Tr. 244:12-21.   M.A. received no written notice in response to this request.   Tr. 250:19-20.

As to Nicole Prince, on February 22, 2005, Pl. Ex. 803, and again in March 2005, Pl. Ex. 805, she asked to be added to her child's case.  Ms. Prince never received a written notice in response to either of her requests to be added to the case.  Prince Decl. ¶ 22.

In addition, L.A.M., M.H., K.T., and Angela Higinio did not receive written notices in response to their requests to be added to their children's public assistance cases.  L.A.M. Decl. ¶ 25; Higinio Decl. ¶¶ 18-19, 21, 22; M.H. Decl. ¶¶ 8-9; K.T. Decl. ¶¶ 7, 9.

Additionally, HRA does not always provide battered qualified aliens and PRUCOL aliens with written notice when an immigrant household applies for public benefits and a case is accepted for the citizen children and denied for the parents.  In these cases, HRA only issues acceptance notices, but the notices do not state which family members were accepted and which were rejected.  Although some versions of the acceptance notices have a space in which to write the name of persons denied benefits when other family member's applications are accepted, HRA workers often do not fill in this space.   These problems were present, for example, in the cases of Marieme Diongue, A.I., P.E., W.J., M.K.B., W.S., and M.T.

As to Marieme Diongue, Ms. Diongue received a notice dated April 21, 2005 that stated that her family was accepted for public assistance, Medicaid, and food stamps.  Pl. Ex. 45; see also Tr. 33:14-17.  The notice (revision February 3, 2003) had a space in which to write the

-34-

names of family members denied benefits, but Ms. Diongue's name was not written in this space.  Id.  A budget printout shows, however, that only Ms. Diongue's citizen daughter was accepted for public benefits, Pl. Ex. 50 at MKB 07836, and that Ms. Diongue was rejected due to her alien status, id. at MKB07837.

As to A.I., in March 12, 2004, HRA issued a notice on A.I.'s family's case stating that the case was accepted.  Pl. Ex. 32.  The notice did not state who in the family was accepted, id., even though, in fact, HRA had accepted the citizen child's application but denied A.I. and her immigrant child's applications, Tr. 104:9-11.  Furthermore, the notice (revision February 2003) did not contain a space in which workers could indicate who was accepted and who was denied.  Pl. Ex. 32.

As to P.E., in November 2003 P.E. received two notices accepting her family's public benefits case.  Pl. Exs. 258, 259.  The first notice, dated November 7, 2003, accepted the case for food stamps but did not state which family members were accepted for benefits and which were rejected, Pl. Ex. 259, even though, in fact, P.E. and her immigrant child E.E. were denied food stamps.  The second notice, dated November 22, 2003, stated that the case was accepted for public assistance, food stamps, and Medicaid.  Pl. Ex. 258.  That notice (revision January 24, 2001) did not have a space in which to indicate which family members were denied public assistance or food stamps but did have a space in which to indicate which family members were denied Medicaid.  Pl. Ex. 258.  Although P.E. and E.E.'s names were not written in that space, id., they did not receive Medicaid benefits, Tr. 277:8-278:18.  And P.E.

never received a separate notice stating that she and E.E. were denied benefits.  Tr. 280:20-23.

As to W.J., in February 2003 W.J. received a notice from the Greenwood Job Center stating that her family's benefits case had been accepted.  Pl. Ex. 991.  The notice did not state which family member's applications were accepted or denied, id., even though W.J. and her immigrant child K.M. were in fact denied public benefits and only her citizen children were accepted.  W.J. Decl. ¶¶ 12, 15-16.  The notice (revision January 24, 2001) did not have space in which to indicate which family members were denied public assistance or food stamps, but did have space in which to indicate which family members were denied Medicaid, and this space was left blank.  Pl. Ex. 991.  W.J. never received a written notice stating that she and her immigrant child were denied benefits.  W.J. Decl. ¶¶ 12, 15-16.

As to M.K.B., in October 2005 M.K.B. received a notice stating that her case had been accepted for public assistance and Medicaid.  Pl. Ex. 765.  The notice did not inform M.K.B. that only her citizen child would be receiving assistance and that she and her two older children would not be receiving benefits.  Id.  The notice (revision May 2005) had a space in which to indicate which family members were denied benefits, but all the spaces were left blank, id.  The same problem arose with M.K.B.'s food stamps case.  The notice (revision date May 2005), dated October 20, 2005, indicated that the application was approved, and included a space in which to indicate which family members were denied benefits, but it was left blank, M.K.B. Decl. Ex. M, even though M.K.B. and her immigrant children were denied food stamps.

-36-

M.K.B. never received a written notice informing her that she was denied benefits.  M.K.B. Decl. ¶ 11.

As to W.S., a notice dated April 14, 2005, was issued to W.S. stating that her family's public assistance, Medicaid, and food stamp case was accepted.  W.S. Decl. Ex. F.  The notice (revision February 2003) had a space in which to indicate which family members were accepted and which were denied for each type of benefit.  Id.  Those spaces were all left blank, even though W.S.'s child was accepted for all benefits and W.S. was accepted only for public assistance and Medicaid.  W.S. Decl. ¶ 23; see also Tr. 405:2-24, 424:23-425:10.

As to M.T., in August 2002 M.T. applied at the Hamilton Job Center for benefits for herself and her two children.  M.T. Decl. ¶ 12. Subsequently, her two children were approved for benefits, but the center denied benefits to M.T. because of her immigration status.  Id. The notice approving benefits for her children did not address M.T.'s application, and she never received a written notice of the denial of her application.  M.T. Decl. ¶ 12; Pl. Ex. 938.

As noted, some of the wrongful denials described above were partly based on the misperception that anyone who had not been a lawful resident for five years could not qualify for benefits.  In addition to this being a wrongful ground for denial in the case of battered qualified aliens and PRUCOL aliens, it was also the basis for wrongful denials in other cases.  For example, Galina Rybalko[7] became a qualified alien in April 2000, Pl. Ex. 173; received her green card in June 2003,

---

[7]    The Court hereby grants Galina Rybalko's motion to intervene.

Pl. Ex. 173; became eligible for food stamps in April 2005, five years after she became a qualified alien, but was wrongly denied same, because the City failed to add together the time in which she was a parolee and the time she had been a lawful permanent resident, Tr. 325:20-326:17, 329:13-330:8.

        The fact that the numerous problems evidenced above were not only frequent but also were the result of HRA customs and usages is shown, among other ways, by the fact that HRA policy makers, such as Elaine Witty, Ivelia Sisco, Cecile Noel and Jane Corbett, were aware that HRA workers were having difficulty appropriately handling the cases of battered qualified aliens, certain lawful permanent residents,  and PRUCOL aliens, and yet took little action to correct the problems.

        Elaine Witty, Director of OIRA, is responsible for overseeing all of HRA's "refugee, immigrant, and limited English-speaking ability (LESA) policies and implementing a comprehensive set of strategies to ensure equal access and effective services to LESA and refugee/immigrant clients."   Pl. Ex. 889.   Ivelia Sisco has been the director of procedures for public assistance, Medicaid and food stamps for five years.  Tr. 967:11-15.  In that capacity, she has primary responsibility for developing procedures relating to immigrant eligibility for public assistance, food stamps, and Medicaid.  Tr. 968:10-14.

        On more than one occasion in the last two years Elaine Witty told Ivelia Sisco that immigrants were being denied public benefits because workers do not understand the eligibility rules.  Tr. 971:4-14. Ms. Sisco, in turn, shared this information with the participants in the

-38-

weekly Office of Procedures and Training managers' meeting. Tr. 971:15-18. Ms. Witty also knew that "workers have trouble identifying immigration documents," Tr. 921:18-21, and that immigrant victims of domestic violence were experiencing difficulty in having benefits issued to them, Tr. 925:16-22. Ms. Witty informed Jane Corbett, Tr. 925:23-926:6, and Ivelia Sisco, Tr. 926:7-9, of this problem. Jane Corbett is Executive Deputy Commissioner of the Office of Policy and Program Development and Ms. Witty's direct supervisor. Tr. 925:23-926:6.

Ms. Witty was also aware that HRA employees had trouble applying the eligibility rules pertaining to persons with filed or approved I-130 petitions and proof of abuse. Tr. 927:7-11, 928:5-11. She told Ms. Corbett, Tr. 928:19-929:10, and Ms. Sisco, Tr. 981:20-24, of this problem. Ms. Sisco told Mr. Dichian in the summer or fall of 2004 that domestic violence victims with I-130s were being denied public benefits. Tr. 700:18-702:4.

Ms. Witty was also aware that HRA workers sometimes had difficulty with the eligibility rules regarding PRUCOL individuals. Tr. 932:6-8. She informed Ms. Sisco of this problem. Tr. 932:16-21. Ms. Witty also told Ms. Sisco within the last year that workers were having difficulty handling mixed status households. Tr. 934:23-935:3, 980:19-22. Ms. Witty also knew that HRA workers were having difficulty opening cases in the computer system for people who did not have Social Security numbers. Tr. 918:13-16.

Yet despite all this high-level awareness of the problems, no meaningful corrective action was taken.

By way of example, in July 2004, Ms. Ganju and other advocates attended a meeting with Cecile Noel.  Cecile Noel is HRA's Deputy Commissioner for Domestic Violence Emergency Services.  Tr. 478:21-23. One of Ms. Noel's responsibilities is supervision of the "ADVENT" program that consists of units within Job Centers that deal exclusively with domestic violence victims.  Tr. 479:1-4.  Although ADVENT workers are not involved in processing initial applications, they are involved at subsequent stages after the initial application has been completed. Tr. 512:1-5.   At that meeting, Ms. Ganju expressed her belief that ADVENT workers "did not know the alien eligibility rules," and that it was important that they do so because they were dealing with battered qualified immigrants frequently.   Tr. 479:16-20, 482:21-483:1.   Ms. Ganju also presented Ms. Noel with a letter requesting additional and comprehensive  training  for  ADVENT  staff  on  battered  immigrant eligibility for public benefits.  Pl. Ex. 778.  Ganju stated that she had seen ADVENT workers discontinue benefits based on a misapplication of immigrant eligibility rules.  She sent a copy of this letter to Elaine Witty.   Tr. 512:13-16.   In October, Ganju followed up on her initial conversation and provided training materials to Ms. Noel and Ms. Witty on immigrant eligibility issues.  Tr. 483:5-18.  Yet Ms. Witty's office subsequently failed to provide ADVENT workers with any training on immigrant eligibility, nor is Ms. Witty aware of anyone else at HRA having done so.   Tr. 947:7-18.

While most of the difficulties in the system described above result from inadequacies in the City's practices, the State Defendants also have some responsibility for these inadequacies not only as a

-40-

matter of failure to adequately supervise but also as a result of their own inadequate training materials and the like. For example, some OTDA training materials, which are produced by Rockefeller College, Pl. Ex. 677; Tr. 1163:25-1164:6, leave all battered qualified aliens off the list of immigrants eligible for federal and State public benefits. Indeed, the December 2005 OTDA training materials — the State's most current training materials on food stamp household composition and alien eligibility, Tr. 1154:4 — omit battered qualified aliens from the list of immigrants eligible for federal food stamps. Pl. Ex. 677 at MKB-OTDA 10437. Likewise, the February 2004 OTDA training materials repeatedly omit battered qualified aliens from the list of immigrants eligible for federal public benefits. Pl. Ex. 536 at MKB01355-1358. These materials list the groups of immigrants who may be eligible for federally-funded public assistance, food stamps, and Medicaid, Pl. Ex. 536 at MKB01355, but do not indicate that battered qualified aliens are eligible for benefits, Pl. Ex. 536.

These same materials also omit battered qualified aliens from the list of immigrants eligible for State public assistance and State Medicaid. They state only that lawful permanent residents who are ineligible for federal public assistance may receive Safety Net Assistance (State public assistance). Pl. Ex 536 at MKB01357. These materials never explain that battered qualified aliens who are ineligible for federal Medicaid or federal public assistance may nonetheless be eligible for State Medicaid or State public assistance. Pl. Ex. 536.

-41-

In addition, previous versions of the OTDA desk aid failed to note that battered aliens may qualify for benefits if they present certain documents besides a "prima facie" notice. OTDA's 2000 desk aid, which was utilized in trainings at least through December 2002, Tr. 1166:21-25, 1167:2, listed an "INS 'Notice of Prima Facie Case'" as the only document that a battered qualified alien may provide. Pl. Ex. 1165. It is true that in May 2003, OTDA amended the desk aid, adding an I-360 approval notice to the list of common documentation supporting the battered qualified alien status, Pl. Ex. 529 at MKB01287, and that in December 2004, OTDA amended the desk aid again, adding to the list of common documentation supporting the battered qualified alien status a number of documents that are evidence of a pending or approved I-130 or I-360, including certain K and V visas and employment authorization cards with certain codes. Pl. Ex. 532 at MKB01300. But it was not until after the Court's Order of February 16, 2006 that OTDA issued a new desk aid that clarified the proper rules, and even then it had to be further amended on June 26, 2006. See State Ex. WW; State Ex. XX; see also Letter from Ivan B. Rubin, Counsel for State Defendants, to the Court, dated July 18, 2006, referencing 06-INF-23. And even today, no other OTDA policy statements or training materials besides the desk aid indicate that individuals with an I-130 and evidence of domestic violence are eligible for benefits. Tr. 702:8-11.

Likewise, in a 2002 overview of domestic violence policies and procedures, OTDA responded to the question, "What is the 'battered alien' provision," by referring only to immigrants with approved I-360 petitions or prima facie notices under VAWA. Pl. Ex. 526 at MKB01242.

-42-

No mention was made of battered immigrants who could provide evidence that an I-130 had been filed on their behalf.  Id.  Similarly, in a 2002 informational letter answering the same question, OTDA again only referred to those battered immigrants with approved or prima facie notice under VAWA.  Pl. Ex. 523 at MKB01213.  Again, it was only as a result of this lawsuit that OTDA, on March 22, 2006, issued an updated information letter on battered qualified alien benefit eligibility and a new Alien Eligibility Desk Guide that corrected the earlier oversights.  Tr. 1142, 1147; State Defs.' Ex. WW and XX.

Regarding the problem with Social Security numbers, State policy memoranda and training materials state that a Social Security number is required for the receipt of State public benefits, even though the State's actual policy is that battered qualified aliens do not have to provide a Social Security number in order to be eligible for such benefits.  For example, State Informational Letter 02 INF 40 notes that "Furnishing an SSN is a condition of temporary assistance eligibility" and instructs that "Districts should advise aliens as early as possible of the requirement to furnish a Social Security number . . . ."  Pl. Ex. 631 at 2.  Likewise, the letter prescribed by the State for use by clients in applying for a Social Security number, see infra, refers to 18 N.Y.C.R.R. § 351.2 and states unconditionally that "all applicants and legally responsible relatives must provide a Social Security number as a condition of eligibility for receipt of temporary assistance."  Pl. Ex. 631, Attachment.

Mr. Dichian testified that "we have conflicting regulations," Tr. 656:20-21, and that he "rel[ies] on a different regulation, which

-43-

is in 369.2," which requires that people need only be furnishished or apply for a Social Security number as a condition of eligibility, Tr. 657:7-10.  In open court, counsel for the State represented that "it [is] the state's position right now that VAWA self petitioners who have been denied Social Security numbers because they can't qualify for Social Security numbers until the VAWA self petition is approved should receive public assistance."  Tr. 668:13-18.

When a government entity, such as HRA or OTDA, refers an alien to the Social Security Administration for a Social Security number because the alien needs one to qualify for a federal benefit, the Social Security Administration requires that the referral letter, inter alia, cite "the federal statute or regulations requiring the SSN as a condition to receive the benefit or service."  Pl. Ex. 541 at MKB01475-76.  OTDA prescribes such a letter, Pl. Ex. 631, but the letter cites only to state law and regulations, not the federal law or regulations requiring the SSN, id., as required by the relevant SSA regulation, Pl. Ex. 541.  As a result, aliens who apply for a Social Security number using these letters are denied Social Security numbers.  The same is true at the City level.  Pl. Ex. 504 at MKB01505

The State's computer system also contributes to the problem. Most of the plaintiffs' and declarants' cases "errored out" in WMS, the State's computer system.  Tr. 1370:7-9; Pl. Ex. 569, 570, 593.

Some of the State's computer problems in these cases result from the fact that the process for opening a multi-suffix case is not explained in OTDA's Authorization of Grants Manual.  State Defs.' Ex. QQ; Tr. 1356:9-12, 880:25- 881:4; Tr. 1346:24-1347:1.  There is nothing

-44-

in OTDA's Authorization of Grants manual explaining how to open a multi-suffix case involving a family with immigrants.  Tr. 877:8-12. Mr. Conly, an HRA worker, did not receive training on when a case needs to have two suffixes.  Tr. 1097:1-6.  OTDA does not provide training to HRA employees on how to open multi-suffix cases.  Tr. 883:21-884:13. The "error correction specialist" and a supervisor at the Greenwood Job Center also did not know how to open a case of this type.  Tr. 1095:10-18.[8]

When workers attempted to open cases with two "suffixes" in WMS, they errored out.  Many of the plaintiffs' cases errored out because they were mixed households or one family member was eligible for state public assistance and one for federal public assistance.  Tr. 1377:2-6; Tr. 403:7-404:5.

It takes several days to open a multi-suffix case in WMS.  WMS is a "batch" system that cycles information on a daily basis.  Tr. 818:5-6, 820:21-25.  When a family member seeking addition to an existing case is eligible for state benefits and has a case in a rejected ("RJ") status, and when the household member with an active

---

[8] Some of the errors were also caused by "cross-edits," which are rules requiring that data entered into a field be compatible with information in other fields.  If cross-edit rules are violated, the case will error out and will not process successfully.  Tr. 1364:1-15, 809:11-20, 849:3-9.  Specifically, information entered by HRA workers regarding alien status (date element 382), Alien number (data element 381), and date of entry (data element 389) are incompatible with information entered regarding whether the individuals are eligible for state or federal benefits (elements 307, 325, 376, 377, and 343), thus leading to errors.  Tr. 1364:19-1365:24, 1370:10-14, 1376:19-1377:1.  For example, an HRA employee testified that A.I.'s case errored out in WMS on March 16, 2004, because of alien status, Tr. 1348:24-1349:15, and errored out again because of alien status starting on November 14, 2005, Tr. 1349:16-1350:21.

Case 1:05-cv-10446-JSR   Document 150   Filed 08/29/06   Page 46 of 84

case is receiving federal benefits, the steps that must be taken to open

such a multi-suffix case in WMS are extremely complex and must be taken

over a series of days.  Tr. 1343:15-21.  On the first day, the worker

must change the entire family to Safety Net Assistance.  On the second

day, the worker must put the immigrants into applying ("AP") status.

Then the worker must activate the lines.  Finally, the worker must split

the suffix into two so that those family members eligible for federal

public benefits are on a separate line from those eligible for state

public benefits.  Tr. 1354:18-1356:8.  A number of the plaintiffs' cases

errored out because workers followed the wrong steps when trying to

follow these complex procedures.  Tr. 1377:7-13.

Although multi-suffix errors may eventually be corrected if a

case is pursued through advocacy, even in such cases these errors cause

delays in clients' receiving benefits for which they are eligible.  For

example, S.M.'s case errored out no fewer than six or seven times before

it was finally opened.  Tr. 403:22-404:5.  Furthermore, even after the

State Defendants represented to the Court that benefits would be

provided to the named plaintiffs, some of their cases continued to error

out multiple times.  For example, after this action commenced, the City

determined that A.I. and her six-year-old daughter W.A. were eligible

for Safety Net Assistance and Medicaid and that W.A. was eligible for

Food Stamps.  On December 23, 2005, HRA's Deputy General Counsel, David

Lock, reported prior attempts to activate their cases "have been

unsuccessful," and that another corrective action to activate their

cases "has been processed."  Pl. Ex. 30A at 2.  Four days later, on

December 27, Mr. Lock reported that "[a]n additional effort occurred

-46-

which prevented us from activating this case over the weekend. We are continuing to work on activating this case." Pl. Ex. 30B. On the next day, December 28, Mr. Lock again reported: "We were not able to open AI's ongoing case today because [of] additional errors. . . . We are continuing to work on the error correction on this case and hope to have it open tomorrow." Pl. Ex. 30C. The case did not open successfully until December 29. Pl. Ex. 30D.

Although this case has primarily focused on battered qualified aliens and PRUCOL aliens, it should also be noted that certain lawful permanent residents were unlawfully denied benefits due to an error in the State's computer system, WMS. In particular, the date a person becomes a qualified alien is relevant to their eligibility for food stamps, Tr. 1381:1-3, and the date an immigrant entered the country is relevant to their eligibility for Temporary Assistance for Needy Families, Tr. 1380:19-25. These dates are sometimes not the same, Tr. 1381:4-5, but WMS has only one date field for immigrants, which must be used to record the date an immigrant entered the country, the date the person became a qualified alien, or any other relevant date. Tr. 871:22-872:17; see also Tr. 1365:5-7. WMS cannot record two separate dates. Tr. 875:4-10, 1335:8-10.

In her testimony, Elaine Witty explained the problem that the single date field causes for people who attain Qualified Alien status prior to attaining lawful permanent residency:

> Q. Isn't it true that some time in 2004, you learned that WMS cannot maintain a record of both the date someone became a qualified alien and the date that person became a lawful permanent resident?
>
> A. Yes.

Q. And did this feature of WMS cause you concern?

A. Yes.

Q. And why did it cause you concern?

A. I was concerned that the LPR date would override the date of becoming a battered qualified alien.

Q. And why did that cause you concern?

A. I was concerned that by losing the date a person becomes a battered qualified alien, it would affect their eligibility for public benefits.

Tr. 945:19-946:7; see also Tr. 1334:20-22 ("workers were changing the date on the system which was making these people ineligible").   Ms. Ganju testified that this was the problem that prevented Ms. Harris at the Seaport Job Center from opening the state food stamp case of the declarant W.S. in the computer.   Tr. 405:2-24 ("She said that if the client did not have five years of qualified alien status, she couldn't get into the computer.").

However, as a result of this litigation, the WMS system has been modified so that the original date of qualified status for a benefits recipient cannot be overwritten ("lock") when changing to new qualified status such as Legal Permanent Resident. Tr. 1333-1334; see also Tr. 1339-1340; affidavit of David Spielman, sworn to May 5, 2006.

Another type of State notice is generated by the Client Notice System ("CNS"), for which OTDA writes the public assistance and food stamp language, and DOH writes the Medicaid Language, Tr. 861:5-21. See, e.g., Pl. Ex. 1006. When an application for public assistance is rejected, the notice advises the applicant that "The types of aliens who may be able to get Family Assistance benefits or Safety Net Assistance

-48-

benefits include: ..."   Id.   Similarly, when an application for food stamps is rejected, the notice advises that "In order to be eligible to receive benefits in the Food Assistance Program an individual must: ..." Id.   Until March 2006, battered qualified aliens were not included in the lists following this language in either situation.   Tr. 1398:17- 1400:21.

For example, on April 22, 2004 a computerized CNS notice was issued to W.J., stating that she and her son K.M. would no longer receive public assistance and food stamps because they did not meet the eligibility requirements.  Pl. Ex. 1006.   The notice contained a list of immigrant statuses that were eligible for benefits, but battered qualified aliens were not listed.   Id. at MKB02602-03, MKB02604-05.   On April 28, 2004, W.J.'s attorney faxed Elaine Witty a copy of the notice, noting that the eligibility criteria set forth in the notice were wrong and that the omission was "probably a systemic issue."   Pl. Exh. 1025 at C14624-36.   After receiving the fax, Ms. Witty showed the notice to Ive Sisco, who concluded that there was nothing wrong with it.   Tr. 945:12-17.

Similarly, sample CNS notices included in OTDA training materials from 2005 leave battered qualified aliens off the list of immigrants eligible for food stamps.   Pl. Ex. 1164; Tr. 1167:17-23. These sample notices were identical to the notices in use by OTDA at the time.   Tr. 1167:17-20.[9]

_____

[9] This problem has been partly corrected.   In March 2006, to comply with this Court's Order of February 16, 2006, OTDA changed the language in the Food Stamp section of the computer generated notice of denial issued through CNS to include battered qualified aliens with 5 years in qualified status, or on other specified

## CONCLUSIONS OF LAW

On the basis of the foregoing facts (and a few additional factual findings recited below), the Court reaches the following conclusions of law regarding plaintiffs' request for preliminary injunctive relief relating to their claims under 42 U.S.C. § 1983 and state law:

A party seeking a preliminary injunction must, at a minimum, establish "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting preliminary relief." Fed. Express Corp. v. Fed. Espresso, Inc., 201 F.3d 168, 173 (2d Cir. 2000). Moreover, when, as here, the injunction sought is mandatory, rather than prohibitory, such that it will alter, rather than preserve, the status quo, the party seeking the injunction must make a "clear" or "substantial" showing of a likelihood of success. See Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d Cir. 1995); SEC v. Unifund Sal, 910 F.2d 1028, 1039 (2d Cir. 1990). Based on the foregoing

conditions, as potentially eligible as recipients of food stamps. Tr. 1398-1400, State Defs.' Ex. RR and VV. OTDA also changed the language in the Public Assistance section of the computer generated notice of denial issued through the Central Notice System ("CNS") to include a broadened description of battered qualified aliens as potentially eligible recipients of public assistance. Tr. 1398-1400, State Defs' Ex. UU. OTDA also changed the language in the Public Assistance section of the computer generated notice of denial issued through CNS to include holders of four types of visas as PRUCOL aliens and thus as potentially eligible recipients of public assistance. Tr. 1398-1400, State Defs.' Ex. UU.

facts and reasonable inferences drawn therefrom, the Court concludes that plaintiffs have amply met these burdens in all respects.

At the outset, the Court rejects defendants' argument that the instant suit is barred by res judicata.[10]   The pending claims principally relate to the allegedly defective process by which defendants make benefit eligibility determinations for certain categories of immigrants. These issues were not adjudicated, and need not have been raised, in the case on which defendants rely for their res judicata argument, Reynolds v. Giuliani, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999).   That case involved allegations that defendants deterred and discouraged persons seeking to apply for public benefits, failed to provide qualified applicants with emergency pre-acceptance "immediate needs" public assistance grants and expedited food stamps, and failed to make separate determinations on applications for each category of benefits when people filed joint applications for public assistance, food stamps, and Medicaid.   See Complaint, Reynolds v. Giuliani, attached as Ex. A to Aff. of David Lock, sworn to January 24, 2006. Reynolds thus had nothing to do with the accuracy of eligibility determinations. See generally Interoceanica Corp. v. Sound Pilots, 107 F.3d 86, 91 (2d Cir. 1997) ("The fact that both suits involve[] essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues.   A first

_____

[10] Defendants' other purely legal defenses, to the extent applicable to injunctive relief and not otherwise addressed below, were previously rejected in connection with the issuance of the Court's Order of February 16, 2006.

judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.").[11]

Turning, then, to likelihood of success, plaintiffs' federal claims are brought under 42 U.S.C. § 1983, which imposes liability on any person who, under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." Section 1983 provides a cause of action for violations of federal statutes as well as the Constitution, see Maine v. Thiboutot, 448 U.S. 1, 4 (1980), but plaintiffs must establish the violation of a federal right, not just the violation of federal law. See Blessing v. Freestone, 520 U.S. 329, 340 (1997); Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) ("it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [Section 1983]." (emphasis in original)). Such federal rights must be "unambiguously conferred" in

---

[11] It is true that one of plaintiffs' additional claims that defendants have a practice of preventing, discouraging, or deterring persons from applying for public benefits was in issue in Reynolds, but here it pertains to conduct that occurred after April 2001, when the record in Reynolds closed. See Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 383 (2d Cir. 2003) ("Claims arising subsequent to a prior action need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by res judicata regardless of whether they are premised on facts representing a continuance of the same course of conduct."). Moreover, the claim is not addressed in the instant motion for injunctive relief.

the relevant statute, as indicated by "rights-creating" language and by
an individual, rather than aggregate, focus.  See Gonzaga Univ. v. Doe,
536 U.S. 273, 283, 287, 288 (2002).  More specifically, the following
factors are particularly relevant in assessing whether a statute confers
a federal right:

> First, Congress must have intended that the provision in
> question benefit the plaintiff.  Second, the plaintiff must
> demonstrate that the right assertedly protected by the statute
> is not so "vague and amorphous" that its enforcement would
> strain judicial competence.  Third, the statute must
> unambiguously impose a binding obligation on the States. In
> other words, the provision giving rise to the asserted right
> must be couched in mandatory rather than precatory terms.

Blessing, 520 U.S. at 340-41.

Plaintiffs argue that 42 U.S.C. § 1396a(a)(8), 7 U.S.C. §
2020(e)(3), and 7 U.S.C. § 2020(e)(9), along with various implementing
regulations, confer such federal rights.  The Court agrees.

With respect to Medicaid benefits, 42 U.S.C. § 1396a(a)(8), a
provision of the Medicaid Act, provides that "all individuals wishing
to make application for medical assistance under the [Medicaid] plan
shall have opportunity to do so, and that such assistance shall be
furnished with reasonable promptness to all eligible individuals."
Thus, the statute, on its face, was plainly designed to benefit persons
like the plaintiffs here, and Congress's focus in enacting this
provision was on the individual, rather than the aggregate or the
responsibilities of state actors.  Further, the obligations imposed are
neither vague nor amorphous, especially since plaintiffs are primarily
challenging the accuracy of eligibility determinations, an evaluation
of which is well within the judiciary's competence.  Further, the
statutory language is mandatory ("shall have opportunity to do so"

-53-

(emphasis added) and "assistance shall be furnished" (emphasis added)).
It is therefore apparent, as numerous courts have held, that this
provision unambiguously confers a federal right to receive Medicaid
benefits, if eligible, enforceable in an action brought under § 1983.
See Sabree v. Richman, 367 F.3d 180, 189-93 (3d Cir. 2004); Bryson v.
Shumway, 308 F.3d 79, 88 (1st Cir. 2002); Doe v. Chiles, 136 F.3d 709,
714, 719 (11th Cir. 1998); Reynolds v. Giuliani, 35 F. Supp. 2d 331, 341
(S.D.N.Y. 1999); Alexander A. v. Novello, 210 F.R.D. 27, 35 (E.D.N.Y.
2002); see also Rabin v. Wilson-Coker, 362 F.3d 190, 201 (2d Cir. 2004)
(enforcing a similar right under 42 U.S.C. § 1396r-6(a)).[12]

Similarly, 7 U.S.C. § 2020(e)(3), a provision of the Food Stamp
Act on which plaintiffs also rely, provides that "the State agency shall
thereafter promptly determine the eligibility of each applicant
household by way of verification of income ..." This language, too, is
plainly intended to benefit the plaintiffs, applicants for food stamps;
the obligations imposed are neither vague nor amorphous; and the statute
is couched in mandatory terms ("the State agency shall" (emphasis
added)). As a result, the Court concludes that this statute likewise
confers a federal right, enforceable under § 1983. See Williston v.
Eggleston, 379 F. Supp. 2d 561, 574-78 (S.D.N.Y. 2005); Reynolds v.
Giuliani, 35 F. Supp. 2d at 340-41; cf. Victorian v. Miller, 813 F.2d
718, 721 (5th Cir. 1987) (en banc) ("We conclude that the [Food Stamp]

---

[12] To the extent, however, that plaintiffs assert claims under
42 U.S.C. § 1396a(a)(5), see Complaint ¶ 360, this Court adheres to
its prior conclusion that this provision does not confer a federal
right. See Graus v. Kaladjian, 2 F. Supp. 2d 540, 543 (S.D.N.Y.
1998); see also DaJour B. v. City of New York, 2001 U.S. Dist.
LEXIS 10251 (S.D.N.Y. 2001).

Act creates enforceable rights within the meaning of section 1983."); Roberson v. Giuliani, No. 99 Civ. 10900 (DLC), 2000 WL 760300, at *11 (S.D.N.Y. Jun 12, 2000); Meachem v. Wing, 77 F. Supp. 2d 431, 440 (S.D.N.Y. 1999).

Finally, 7 U.S.C. § 2020(e)(9), another provision of the Food Stamp Act, provides that, in the context of applications for expedited food stamps, "the State agency shall -- (A) provide coupons no later than 7 days after the date of application to any household which [falls below certain income levels]." Once again, the provision is obviously intended to benefit the plaintiffs; it is neither vague nor amorphous in its requirement that food stamps be provided to eligible individuals; and it speaks in mandatory terms ("the State agency shall" (emphasis added)). Under these circumstances, the Court finds that this provision also confers a federal right enforceable under § 1983. See Reynolds, 35 F. Supp. 2d at 340-41; Roberson, 2000 U.S. Dist. LEXIS 7965 at *11.[13]

Plaintiffs also allege violations of the due process clause of the U.S. Constitution, which are, of course, cognizable under § 1983.

Additionally, plaintiffs assert pendent causes of action under state law – specifically, N.Y. Soc. Serv. Law §§ 158(1)(g), 122(b), 122(c), and 366(1)(a). Defendants nowhere contend that plaintiffs do

---

[13] Defendants have failed to rebut the resulting presumption that these rights are enforceable under § 1983 by offering evidence that Congress has explicitly foreclosed a § 1983 remedy in this instance or has established a remedial scheme sufficiently comprehensive to supplant the § 1983 remedy, see Blessing, 520 U.S. at 341. In particular, the Court notes that the availability of a State "fair hearing" does not deprive plaintiffs of a § 1983 remedy. See Wright v. City of Roanoke, 479 U.S. 418, 428 (1987) ("the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983").

not have a right of action under these statutes — undoubtedly because they recognize that New York uses a very permissive standard to determine whether a private right of action is implied in a statute, to wit: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." Sheehy v. Big Flats Cmty. Day, 73 N.Y.2d 629, 633 (1989); Carrier v Salvation Army, 88 N.Y.2d 298, 302 (1996); see also Colavito v. New York Organ Donor Network, Inc., 438 F.3d 214, 231 (2d Cir. 2006). In the case of each of the four state statutes here invoked, a private right of action is clearly implied under the foregoing test, because each of the statutes was enacted to benefit plaintiffs; recognizing a private right of action would further the legislative purpose, see Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 330 (1983); and doing so would in no way be inconsistent with the legislative enforcement scheme, see Uhr v. East Greenbush Cent. Sch. Dist., 94 N.Y.2d 32, 40 (1999).

As to plaintiffs' very substantial likelihood of success under each of their causes of action, it is obvious from the foregoing findings of fact that each of the plaintiffs was erroneously denied public assistance, Medicaid benefits, and/or food stamps, in violation of their federal and state rights.   As set forth in detail in the foregoing findings of fact:

Plaintiff Marieme Diongue, a PRUCOL alien, initially applied for Medicaid and public assistance in March 2005; was repeatedly and wrongly

-56-

told that she was ineligible; and did not receive benefits until after
this suit was initiated.

Plaintiff A.I., an I-130 battered qualified alien, initially
applied for public assistance, Medicaid, and food stamps in March 2004;
was repeatedly and wrongly told that she was ineligible; and did not
receive benefits until after this suit was initiated.

Plaintiff M.E., an I-130 battered qualified alien, initially
applied for public assistance in July 2002; was directed to apply for
a Social Security number and was rejected by the Social Security
Administration; began receiving benefits many months later; had her
benefits reduced in September 2004 because the caseworker erroneously
believed she needed a Social Security number or green card; had her
benefits restored due to advocacy; was later told she needed a prima
facie notice to be eligible; was again told to apply for a Social
Security number and was denied, leading a caseworker to wrongly decrease
her benefits; and did not have her benefits fully restored until after
this suit was filed.

Plaintiff J.Z., an I-130 battered qualified alien, initially
applied for public benefits in July 2004; was erroneously told that she
had failed to establish an eligible immigration status; re-applied in
September 2004 and was wrongly told that she was ineligible because she
was not a citizen; presented a copy of her I-360 prima facie notice,
which she had received the month before, in January 2005, and was added
to her children's case but was wrongly rejected for food stamps;
received a favorable fair hearing decision regarding her eligibility for
food stamps; presented the fair hearing decision to a HRA worker, who

-57-

wrongly rejected it because J.Z.'s prima facie notice was about to expire, even though J.Z. had an I-360 approval notice; and wrongly had her benefits terminated.

Plaintiff M.A., an I-130 battered qualified alien, initially applied for public benefits in July 2005; was wrongly advised that she was ineligible; received a favorable fair hearing decision; presented her documentation and the fair hearing decision to the caseworker, who erroneously said that M.A. was ineligible because she did not have a prima facie notice; returned several days later and was wrongly told by another worker that she was ineligible because she did not have a green card; and did not receive benefits until December 29, 2005 after the filing of this action.

Plaintiff P.E., an I-130 battered qualified alien, initially applied for public benefits in June 2003 to an HRA worker who wrongly refused to take an application from her; re-applied in November 2003 and was wrongly told that she was ineligible because she did not have a green card or Social Security number; re-applied in November 2004, and was initially approved, but in March 2005 her benefits were wrongly terminated because she did not have a Social Security number; met with another HRA worker in June 2005, who erroneously told her that she was ineligible due to immigration status and because she did not have a Social Security number; and received a favorable fair hearing decision, but HRA failed to comply with the decision until this action was filed in December 2005.

Plaintiff O.P., a PRUCOL alien, initially applied for public benefits in May 2005; was erroneously told that she was ineligible

because she did not have a green card; received a favorable fair hearing decision; re-applied in August 2005, but was again wrongly told by a worker that her application would be denied because she did not have a green card; returned in September 2005 and was wrongly told that her application would be denied because of her deferred action immigration status; re-applied in October 2005 and was wrongly told that she was ineligible because she did not have a green card; and is currently receiving public assistance and Medicaid, which she began receiving in January 2006, shortly after this suit was filed.

Plaintiff L.W., an I-130 battered qualified alien, initially applied for public benefits in March 2005; received cash and food stamps for a short period of time but then the benefits stopped; re-applied in May 2005 and was erroneously rejected "because of alien status"; began receiving benefits, but not food stamps, in July 2005 due to advocacy; and did not receive food stamps until December 2005, after this suit was filed.

Plaintiff M.K.B., an I-130 battered qualified alien, initially applied for public benefits in September 2005; was asked for Social Security numbers for her two older children and was wrongly told they were ineligible when she could not produce them; was rejected for public benefits because the HRA worker wrongly categorized her as an "undocumented alien"; finally had a case opened for her in February 2006 as a result of this litigation, but by which time M.K.B. had filed an I-360 VAWA self-petition, which included her children as "derivatives"; as a result of which, the case was a "multi-suffix" case and repeatedly "errored out."

Plaintiff Denise Thomas, an I-360 battered qualified alien, met with HRA workers in September 2004, January 2005, and March 2005; was wrongly told that she needed a Social Security number and that she needed to be a citizen for five years; presented her prima facie notice, but did not receive any benefits; and eventually received benefits in July 2005 due to advocacy, but only received retroactive benefits in December 2005.

Plaintiff L.A.M., a PRUCOL alien, asked to be added to her citizen daughter's public assistance case in summer 2005; was wrongly told by an HRA worker, after consulting with a supervisor, that she was ineligible because she was not a citizen or green card holder and did not have a prima facie notice; re-applied in October 2005, spoke with three different workers, and was repeatedly but erroneously told that she was ineligible because she was not a citizen or green-card holder; and finally received benefits in December 2005 in connection with the filing of this suit.

Plaintiff Galina Rybalko, a qualified alien as of April 2000 and a lawful permanent resident (with a green card) as of June 2003, became eligible for food stamps in April 2005 because she had resided in the United States in a qualified status for five or more years; was wrongly told by an HRA worker that she was ineligible because she had not had her green card for five years; and had not yet received benefits at the conclusion of the evidentiary hearing in this case.

Plaintiffs were also denied adequate notice of the denial of their applications, in violation of the due process clause of the U.S. Constitution.  In evaluating a procedural due process claim, the Court

-60-

evaluates "whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or federal statutes" and, if so, "what process was due before the plaintiff could be deprived of that interest." Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995). Persons who are qualified to receive welfare benefits have a legitimate claim of entitlement to such benefits. See Goldberg v. Kelly, 397 U.S. 254, 261-62 (1970) (public assistance benefits); Atkins v. Parker, 472 U.S. 115, 128 (1985) (food stamp benefits); Mathews v. Eldridge, 424 U.S. 319, 332 (1976) (social security disability benefits); Reynolds, 35 F. Supp. 2d at 340-41; Rooney v. Shalala, 879 F. Supp. 252, 255 (E.D.N.Y. 1995) ("There is now generally recognized a significant property interest in the fair adjudication of a claimant's eligibility to receive disability benefits." (internal quotations omitted)); see generally McMenemy v. City of Rochester, 241 F.3d 279, 286 (2d Cir. 2001).

Under the test set forth in Mathews, a court, in order to determine what process is due, must balance three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335. The Court here concludes that the notice afforded plaintiffs was inadequate because the plaintiffs had a considerable private interest in being accurately apprised of adverse eligibility determinations; the

inaccurate notices they received made it extremely difficult to identify and rectify erroneous determinations; modified notices that accurately convey HRA's decisions would be of considerable value; and the cost to develop and implement such notices is minimal.

Thus, as set forth in detail in the foregoing findings of fact, when plaintiff Marieme Diongue was rejected for benefit, she received a notice that stated that her family's case was accepted for public assistance, food stamps, and Medicaid, but did not state which family members were accepted and which were rejected for public benefits.

When plaintiff A.I. was rejected for benefits, she received a notice that stated that her family's case was accepted for food stamps, but that did not state which family members were accepted and which were rejected for public benefits.

When plaintiff J.Z. was rejected for benefits, she received no written notice whatever informing her that she was rejected.

When plaintiff M.A. was rejected for benefits, she received no written notice whatever informing her that she was rejected.

When plaintiff P.E. was rejected for benefits, she received two notices that stated that her family's case was accepted for benefits, but that did not state which family members were accepted and which were rejected for public benefits.

When plaintiff O.P. was rejected for benefits in September 2005, she received no written notice whatever informing her that she was rejected.

When plaintiff M.K.B. was rejected for benefits in October 2005, she received two notices that stated that a public assistance case had

-62-

been opened and that the case was also accepted for Medicaid and food stamps, but that did not state which family members were accepted and which were rejected for public benefits.

When plaintiff L.A.M. was rejected for benefits in October 2005, she received no written notice whatever informing her that she was rejected.

Although it is thus clear that plaintiffs have made an overwhelming showing that the defendants' employees violated federal rights of the plaintiffs conferred by the Constitution and federal laws, as well as plaintiffs' rights under state law, plaintiffs, by bringing suit against the City HRA commissioner in her official capacity and the OTDA and DOH commissioners in their official capacities, are seeking determinations of liability and injunctive relief against the relevant City and State agencies. As to the City, although it is well-settled that municipalities are considered "persons" within the meaning of § 1983 and are therefore amenable to suit thereunder, see Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978),[14] a municipality may not be held liable under § 1983 for the isolated unlawful acts of its employees; rather, "[i]t is only liable when it can be fairly said that the city itself is the wrongdoer." Collins v. City of Harker

---

[14] "The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977) (internal citations omitted); see also Owen v. City of Independence, 445 U.S., 622, 647 n.30 ("By including municipalities with the class of 'persons' subject to liability for violation of the Federal Constitution and laws, Congress -- the supreme sovereign on matters of federal law -- abolished whatever vestige of the State's sovereign immunity the municipality possessed." Id. at 647-648 (footnote omitted).

Heights, 503 U.S. 115, 122 (1992); see also Walker v. New York, 974 F.2d 293, 296 (2d Cir. 1994).[15]  Plaintiffs must therefore establish that the City itself has a policy, custom, or usage that caused the deprivation of plaintiffs' rights.  See Monell, 436 U.S. at 690-91; see also Canton v. City of Harris, 489 U.S. 378, 385 (1989); Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004).   "To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation."  Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004).  For example, a municipality will be liable under § 1983 if it is established that subordinates' unlawful practices are "so permanent and well settled as to constitute a 'custom or usage' with the force of law," thereby implying the constructive acquiescence of policy-making officials.  Sorlucco v. New York City Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992) (quoting Monell, 436 U.S. at 691); see also Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997) ("Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."); Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (municipal liability may result from "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.").  Similarly,

_____

[15] While it is not clear whether there is a similar requirement under state law, cf. Brown v. State, 89 N.Y.2d 172, 194 (1996), the Court need not decide this issue at this juncture, since it finds that, at most, the state requirement would not exceed the federal requirement, which here is amply met.

a municipality will be liable under § 1983 for failure to train its employees where the failure to train amounts to deliberate indifference to the rights of those within its jurisdiction. See Amnesty Am., 361 F.3d at 126 ("where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence may be properly thought of as a city 'policy or custom' that is actionable under § 1983") (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  Under any scenario, however, there must be a causal link between the policy, custom, or practice and the alleged injury in order to find liability against a municipality. See Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).

Here, plaintiffs have not shown simply "isolated unconstitutional acts of ... employees," Sorlucco, 971 F.2d at 870. Instead, they have made a very substantial showing that the mistaken determinations were the direct results of the flawed design of the City's computer system ("POS"), the pervasive errors in the City's training materials and policy directives, and the widespread worker ignorance resulting from the inadequate training of the City employees. Moreover, the City Defendant had notice of all of these systemic failings.  Effectively, then, the City had a policy, custom, and usage of denying benefits to eligible qualified battered aliens, lawful permanent residents who had been in that status for less than five years, and (with respect to state benefits) PRUCOL aliens.  Put another way, the plaintiffs have made a clear and substantial showing that the City itself was the "moving force" behind the violations of plaintiffs'

-65-

federal and state rights, and is therefore liable under § 1983 and cognate state statutes.  See Polk County v. Dodson, 454 U.S. 312, 326 (1981).

For example, the City's computer system, POS, was so plagued with errors that, for a period of time, workers could only access the appropriate screens for opening a case for a battered qualified alien by selecting an inappropriate option.  As a result, many workers did not know how to access the screens.  Others miscoded battered qualified aliens so that they would receive benefits, but the benefits would later be discontinued when the alien could not verify the status chosen.  HRA policymakers were aware of these systemic deficiencies, but did little or nothing to fix them.

Again, because of the lapses and misinformation in the City manuals and directives, City workers repeatedly misapplied the relevant eligibility rules, demanded irrelevant documentation (such as "prima facie notices," green cards, and Social Security numbers) from immigrants who were eligible even though they did not have those documents, and wrongly denied eligibility as a result.  Moreover, for the same reasons, City workers were often entirely unaware that I-130 battered qualified aliens were eligible for benefits; indeed, many City policy documents and training materials made no mention whatever of this category of aliens.  These problems were pervasive, affecting many aliens, and were brought to the attention of HRA policymakers.

Moreover, as a result of inadequate training and information, the City had a pervasive custom affecting many aliens — and one of which

-66-

City policymakers were well aware — of wrongly denying state benefits to eligible aliens who could not obtain Social Security numbers.

In addition, the form letters provided by the City (and State) to aliens to obtain a Social Security number failed to reference the information required to obtain a Social Security number and therefore were destined to fail. These are standard forms, the inadequacy of which was repeatedly called to policymakers' attention.

Further, the City's notices in cases involving parents and children frequently failed to indicate that only the children were being approved for benefits. Additionally, the City (and State) issued misleading computerized notices that failed to list battered qualified aliens as one of the categories of immigrants eligible for public benefits.

Further still, the City's rules governing PRUCOL eligibility were systematically misapplied, chiefly because City policy bulletins and training materials contained many errors concerning PRUCOL eligibility (or ignored the category altogether), and HRA policymakers had ample notice of these problems.

Without multiplying examples even further, the Court readily concludes that, given the pervasive and systemic nature of the various problems resulting in the unlawful denial of benefits to plaintiffs, plaintiffs have established a very high likelihood that the City will be found liable on all of plaintiffs' claims.

Beyond all else, plaintiffs have also clearly established for these purposes an overwhelming likelihood of success on their contention that the City, in its failure to adequately train its employees, was

-67-

"deliberately indifferent" to the violation of plaintiffs' federal
rights.  See City of Canton, 489 U.S. at 388.  A municipality will be
liable because its failure to train amounts to deliberate indifference
if the plaintiff can show "(1) that 'a policymaker of the municipality
knows to a moral certainty that its employees will confront a given
situation'; (2) that 'the situation either presents the employee with
a difficult choice of the sort that training or supervision will make
less difficult or that there is a history of employees mishandling the
situation'; and (3) that 'the wrong choice by the employee will
frequently cause the deprivation of a citizen's constitutional rights.'"
Nicholson v. Scoppetta, 344 F.3d 154, 166 (2d Cir. 2003) (quoting Walker
v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992).  See also
Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 (2d Cir. 2004)
("While a failure to supervise claim requires allegations as to the
violation itself and policymakers' reaction to it, a failure to train
claim also requires evidence as to the city's training program and the
way in which that program contributed to the violation.").  All of these
requirements are here satisfied:

        First, HRA policymakers knew to "a moral certainty" that their
employees would encounter the kinds of problems here at issue in
processing applications of battered qualified aliens, PRUCOL aliens, and
certain lawful permanent residents who had been in that status for less
than five years.  The evidence establishes that these policymakers were
aware that these constituencies frequently applied for benefits, and
that eligibility workers often misunderstood the eligibility rules.  For
example, Ms. Ganju testified that she alone represented 50 to 60

-68-

battered aliens applying for public benefits during her 28 months at Sanctuary for Families.  Tr. 474:16-475:2.[16]

Second, adequate training or supervision would clearly have made the responsibilities of the City workers less difficult in this situation, and, in its absence, there is a clear history of employees mishandling the determinations.  For example, the lack of awareness by HRA caseworkers of the eligibility of I-130 battered qualified aliens and PRUCOL aliens is attributable in large part both to defective training materials used by the City to train those workers and to corresponding defects in the POS computer system that they utilize on a daily basis.  The Office of Immigrant and Refugee Affairs, in an e-mail to senior State and City officials, expressly stated that "centers/workers need more specific guidance on PRUCOL eligibility," and that "[w]e have been unable to find any policy guidance on the required documentation to establish PRUCOL."  City Ex. MM.  Yet the City took no meaningful action to rectify the situation until this lawsuit was brought.[17]

---

[16] At the evidentiary hearing, the Court invited the defendants to introduce evidence, if there were any, that the number of such cases was small, Tr. 467:10-14; but they chose not to do so, leading to the clear inference that there is a significant number of such cases.

[17] Although the City Defendant argues that she is without authority to rectify the erroneous policy directives and bulletins without approval of OTDA, see Tr. 728:7-10, there remains, even setting aside the flawed directives and bulletins, ample evidence of a custom and practice sufficient to give rise to municipal liability under § 1983.

-69-

Third, the wrong choices by HRA employees brought about by the foregoing conditions "frequently caused the deprivation" of plaintiffs' rights, as already described in detail.

The Court therefore concludes that plaintiffs have established a clear or substantial likelihood of success on their claims brought against the City Defendant under 42 U.S.C. § 1983 and state law.

As for the liability of the State Defendants, although the State had some direct role in the problems here at issue, it is sufficient for present purposes for the Court to conclude, as it does, that the plaintiffs have clearly established a likelihood that the State Defendants will be held vicariously liable for the City Defendant's violations of plaintiffs' federal rights. Under the federal and state statutory scheme governing the administration of public benefits in New York State, HRA is the agent of the State Defendants.[18] See N.Y. Soc. Serv. Law § 65(3) ("The county commissioner shall act as the agent of the department ...."); Robertson v. Jackson, 972 F.2d 529, 534 (4th Cir. 1992) ("A state that chooses to operate its program through local, semi-autonomous social service agencies cannot thereby diminish the

_____

[18] As a result, the Court concludes that hearsay statements of City Defendant's employees are admissible against the State Defendants pursuant to Rule 801(d)(2)(D), Fed. R. Evid.  That Rule provides that a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a sufficient foundation by establishing "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 537 (2d Cir. 1992).  All these requirements have been met here.

obligation to which the state, as a state, has committed itself, namely, compliance with federal requirements governing the provision of the food stamp benefits that are funded by the federal government."); Woods v. United States, 724 F.2d 1444, 1447 (9th Cir. 1984) ("While the state may choose to delegate some administrative responsibilities, the ultimate responsibility for operation of the [food stamp] plan remain[s] with the state.") (quoting California v. Block, 663 F.2d 855, 858 (9th Cir. 1981)); DaJour B. v. City of New York, 2001 U.S. Dist. LEXIS 10251 (S.D.N.Y. 2001) ("the DOH, as the agency responsible for New York State's Medicaid program is accountable for violations of the substantive ... provisions, which do create enforceable rights."); Reynolds v. Giuliani, 118 F. Supp. 2d 352 (S.D.N.Y. 2000).

Although the Second Circuit has not ruled on this issue in the exact factual context here presented, nonetheless, in Henrietta D. v. Bloomberg, 331 F.3d 261, 286-87 (2d Cir. 2003), the Court of Appeals, in addition to generally acknowledging that a number of courts have "take[n] the view that the state's assumption of liability under the Food Stamp and Medicaid Acts renders it liable for violations of those acts by local agencies," 331 F.3d at 286-87, concluded that the State was vicariously liable for the City's constitutional torts in violation of the Rehabilitation Act:

> The common law of contracts strongly suggests that the state defendant is liable to ensure that localities comply with the Rehabilitation Act in their delivery of federally-funded social services. An 'obligor'--that is, one who promises performance in exchange for consideration-cannot rid itself of a duty merely by making an effective delegation. Thus, once a party has made a promise, it is responsible to the obligee to ensure that performance will be satisfactory, even if the promising party obtains some third party to carry out its promise. Here, in accepting federal funds, New York State has promised that its

-71-

> programs will comply with the mandate of the Rehabilitation Act.
> Therefore, under our contract analogy, New York State is also
> liable to guarantee that those it delegates to carry out its
> programs satisfy the terms of its promised performance,
> including compliance with the Rehabilitation Act." (internal
> citations omitted)).

In light of the clear statutory obligations imposed on the State
Defendants, the Court finds that it is consistent with congressional
intent and the bargain struck between the parties to hold the State
Defendants vicariously liable under § 1983 for the City Defendant's
violation of plaintiffs' federal rights.

As for considerations of state sovereignty, "[t]he Eleventh
Amendment ... does not preclude suits against state officers in their
official capacity for prospective injunctive relief to prevent a
continuing violation of federal law." Henrietta D., 331 F.3d at 287
(citing Ex parte Young, 209 U.S. 123, 155-56 (1908)).

Having thus established a clear or substantial likelihood of
success on the merits against both the City Defendant and State
Defendants, plaintiffs are entitled to such injunctive relief as
necessary to prevent irreparable harm. Cf. Bell & Howell: Mamiya Co.
v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983). Given the often
perilous economic circumstances of the plaintiffs in this case, and
those similarly situated, the denial of public benefits to such
individuals unquestionably constitutes irreparable harm. See Mass.
Ass'n of Older Ams. v. Sharp, 700 F.2d 749, 753 (1st Cir. 1983); Martin
v. Weiner, 2006 U.S. Dist. LEXIS 8698 (W.D.N.Y. 2006); Reynolds, 35 F.
Supp. 2d at 339 ("To indigent persons, the loss of even a portion of
subsistence benefits constitutes irreparable injury."); Cincotta v. N.Y.
City Human Res. Admin., No. 00 Civ. 9064 (JSR), 2001 U.S. Dist. LEXIS

11457 (S.D.N.Y. August 9, 2001) ("The loss or potential loss of welfare benefits, including food stamp benefits, can constitute irreparable injury warranting the issuance of a preliminary injunction."); Hurley v. Toia, 432 F. Supp. 1170, 1176 (S.D.N.Y. 1977); cf. Commc'ns Workers of Am., Dist. One v. Nynex Corp., 898 F.2d 887, 891 (2d Cir. 1990) ("the threat of termination of medical benefits to striking workers has been held to constitute irreparable harm"); Whelan v. Colgan, 602 F.2d 1060, 1062 (2d Cir. 1979) ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury"). See generally Goldberg v. Kelly, 397 U.S. 254, 260-65 (1970).

As documented in their declarations, plaintiffs suffer from hunger and poor nutrition because they do not have enough money for food, see, e.g., M.K.B. Decl. ¶¶ 14-15; L.M. Decl. ¶¶ 14-21; L.W. Decl. ¶¶ 22, 27; Fedosenko Decl. ¶¶ 9-10; Fofana Decl. ¶¶ 1, 27; are unable to buy various household necessities, see, e.g., L.A.M. Decl. ¶¶ 37, 41, 43; M.A. Decl. ¶ 21; M.K.B. Decl. ¶¶ 18-22; A.I. Decl. ¶¶ 33-41; are unable to obtain routine health care, treat serious medical conditions, and obtain essential prescription medicines if denied Medicaid, see, e.g., O.P. Decl. ¶¶ 36-40; P.E. Decl. ¶¶ 20, 53; M.K.B. Decl. ¶ 17; and have sometimes become homeless or been threatened with eviction, see, e.g., P.E. Decl ¶¶ 18, 50; N.E. Decl ¶¶ 20, 31.

It is true that defendants have undertaken extensive and commendable ameliorative measures since the filing of this lawsuit, but not to the point where this action is thereby rendered moot, nor the Court deprived of its authority to grant injunctive relief or determine

the other questions before it.  See N.Y. Pub. Interest Research Group,

Inc. v. Johnson, 427 F.3d 172, 185 (2d Cir. 2005) (quoting Friends of

the Earth Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 189 (2000) ("a

defendant's voluntary cessation of a challenged practice does not

deprive a federal court of its power to determine the legality of the

practice.")); Campbell v. Greisberger, 80 F.3d 703, 705-06 (2d Cir.

1996) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)

("[V]oluntary cessation of allegedly illegal conduct does not deprive

the tribunal of power to hear and determine the case, i.e., does not

make the case moot."); Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565,

574 (2d Cir. 2003) ("The defendant's burden is a heavy one to ensure the

allegedly illegal activities do not temporarily cease only to resume

after the claims have been dismissed.") (quoting Friends of the Earth,

Inc., 528 U.S. at 189 (2000)).[19]

        The simple truth, moreover, is that the ameliorative actions now

taken by the City and State Defendants would not likely have been taken

if this lawsuit had not been brought and had the Court not issued its

initial injunction.  The Court therefore keeps that initial injunction

in place in all respects, its value reconfirmed by the evidence adduced

at the subsequent evidentiary hearing.  The only open question is

whether still more injunctive relief is required.

        In this regard, the Court, by Order dated July 12, 2006,

directed the City and State defendants to submit letter briefs

specifying such additional ameliorative measures, if any, that the

---

[19] For similar reasons, the Court hereby denies the State
Defendants' motion to vacate the Court's previous injunction in
this case.

defendants had undertaken since the defendants submitted their post-hearing briefs that might bear on the relief sought by plaintiffs, and gave plaintiffs leave to respond. By letter dated July 20, 2006, in response to defendants' letter briefs, the plaintiffs advised the Court that they still sought the following relief:

As against the State Defendants, plaintiffs seek:

(1) An order directing OTDA to add a second date field to WMS so that the date an immigrant became a qualified alien and the date the immigrant entered the country can both be recorded. The plaintiffs also seek an order directing the State to issue instructions explaining the use of these fields and clarifying that time accrued in different qualified alien statuses should be added together to determine eligibility for federal food stamps.

(2) An order directing OTDA to issue clear and comprehensive instructions on how to open cases for aliens directly in WMS, focusing particularly on multi-suffix cases.

(3) An order directing OTDA to correct 02 INF-40, which on its face is not sufficient to cause SSA to issue a non-work Social Security number (SSN) to an immigrant who lacks work authorization.

(4) An order directing the State to revise its training materials so that they accurately and comprehensively explain which immigrants are eligible for federal Medicaid.

As against the City defendant, plaintiffs seek:

(1) An order directing the City defendant to correct all errors in its revised policy directives and bulletins regarding Social Security

numbers, and to conduct comprehensive training on these policy directives for all staff involved in eligibility determinations.

(2) An order directing the City Defendant to correct errors regarding PRUCOL eligibility in PD 06-24-ELI.  See Letter from Scott Rosenberg, Counsel for Plaintiffs, to the Court, dated August 1, 2006.

(3) An order directing the City to refer all cases involving green card holders who have had their green cards for less than five years to the immigrant liasons, or in the alternative to train all workers involved in eligibility determinations on how to determine the number of years that an alien has been in qualified status, and to train workers on which dates must be entered into POS and WMS.

(4) An order directing the City to conduct trainings for all staff who are involved in opening cases for immigrants directly in WMS.

(5) An order directing the City to issue a policy directive and conduct training on the necessity of providing notices when individuals ask to be added to an existing case, and the need to issue notices listing the individual accepted, those denied public benefits, and the reason for the denial, whenever some members of a household are accepted and others are denied due to immigration status.

(6) An order directing the City to provide all staff who handle eligibility determinations for proposed class members with the same training immigrant liaisons receive.

The aforesaid items sought by plaintiffs are not only reasonable on their face but appear directly designed to remedy any remaining material likelihood that the numerous misdeterminations caused by the

City and State's failings will re-occur.[20]    Accordingly, the Court hereby supplements its prior preliminary injunctive order by adding each of the orders sought by plaintiffs as stated above, to be complied with within a reasonable time (with exact deadlines to be set later only if necessary).

The Court notes that none of these additional requirements is either burdensome or expensive; indeed, in light of what has already been established, they simply make common sense. At the same time, the Court again commends defendants for their ameliorative actions undertaken since this case commenced and forecasts that good faith compliance with these remaining measures may make any but the most general provisions unnecessary in any permanent injunction the Court may ultimately impose.

## CLASS CERTIFICATION

Having resolved the motion for a preliminary injunction, the Court now turns to plaintiffs' motion for class certification. Plaintiffs ask the Court to certify the following class:

> All Affected Immigrants who are, have been, or will be eligible for state or federally funded public assistance, Medicaid, or food stamps, and who either (a) have been or will be denied public benefits in whole or in part; (b) had or will have benefits discontinued or reduced, (c) have been or will be discouraged or prevented from applying; (d) have been or will be encouraged to withdraw an application by a New York City job center because of a misapplication of immigrant eligibility rules.
>
> For purposes of the foregoing paragraph, the term "Affected Immigrants" means (1) battered spouses and battered children of U.S. citizens or lawful permanent residents, who are

_____

[20] It may also be noted that contrary to a fear sometimes voiced by the State Defendants, none of these items is the equivalent of an order requiring the State Defendants to comply with requirements of State law.

Qualified Aliens as defined in 8 U.S.C. § 1641(c); (2) their immigrant children or, in the case of battered children, their immigrant parents, provided that they too are Qualified Aliens as defined in 8 U.S.C. § 1641(c); (3) lawful permanent residents who have been in that status for less than five years; and (4) persons who are Permanently Residing Under Color of Law (PRUCOL).

Under Rule 23(a) of the Federal Rules of Civil Procedure, the Court may not certify a class unless (1) "the class is so numerous that joinder of all members is impracticable" (numerosity), (2) "there are questions of law or fact common to the class" (commonality), (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality), and (4) "the representative parties will fairly and adequately protect the interests of the class" (adequacy).  Rule 23(a), Fed. R. Civ. P.; see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613 (1997)).  If these requirements are met, the Court may still not certify the proposed class unless it also falls into one of the categories set forth in Rule 23(b), Fed. R. Civ. P.

All of the requirements of Rule 23(a) are here satisfied.  The class is so numerous that joinder of all members is impracticable. Impracticable does not mean impossible, but simply difficult or inconvenient.  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993). The Second Circuit has presumed numerosity "at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  A survey of organizations in New York City that assist indigent battered immigrants with filing these applications shows that at least 488 VAWA self-petition cases, 58 battered spouse waiver cases, and 157 applications for U visa interim relief are filed annually on behalf of

indigent battered immigrants in New York City.  Declaration of Camille
Carey dated Dec. 6, 2005 at ¶¶ 3-16.   Over 90 percent of these
applications were submitted with fee waiver requests, demonstrating that
the immigrants were impoverished and likely to be class members in this
case.  Id. at ¶ 16.  Moreover, although invited by the Court to do so,
Tr. 467:10-14, defendants never proffered any evidence to dispute the
numerosity of the proposed class.

        The commonality and typicality requirements tend to merge, so
that similar considerations enter into analysis of Rules 23(a)(2) and
(3).  See General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.
13 (1982); Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 597 (2d Cir.
1986).  The crux of both requirements is to ensure that "maintenance of
a class action is economical and [that] the named plaintiff's claim and
the class claims are so interrelated that the interests of the class
members will be fairly and adequately protected in their absence."
Falcon, 457 U.S. at 157 n. 13.   Specifically, "[t]he commonality
requirement is met if plaintiffs' grievances share a common question of
law or of fact."  Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d
Cir.1997) (per curiam).  Typicality "requires that the claims of the
class representatives be typical of those of the class, and is satisfied
when each class member's claim arises from the same course of events,
and each class member makes similar legal arguments to prove the
defendant's liability."  Id. (internal quotation marks omitted).

        Here, class members share common issues of law and fact:
defendants erroneously and systemically fail to provide public benefits
to members of the class as a result of flaws in computer systems,

-79-

erroneous policy bulletins and directives, and inadequate training.
Although defendants argue that each member of the class was denied
benefits for slightly different reasons and under slightly different
circumstances, the Court of Appeals, in strikingly similar
circumstances, has found that the commonality and typicality
requirements are met:

> The court identified as a common question of law "whether each
> child has a legal entitlement to the services of which that
> child is being deprived." 929 F.Supp. at 690. It identified as
> a common question of fact "whether defendants systematically
> have failed to provide these legally mandated services." Id. In
> characterizing the legal and factual issues in this way, the
> district court determined that the myriad constitutional,
> regulatory, and statutory provisions invoked by the plaintiffs
> are properly understood as creating a single scheme for the
> delivery of child welfare services and as setting standards of
> conduct for those charged with providing such services-
> standards that the defendants are alleged to have violated in
> a manner common to the plaintiff class by failing to operate and
> maintain a functioning child welfare system. The district court
> explained:
>
> > The unique circumstances of each child do not compromise
> > the common question of whether, as plaintiffs allege,
> > defendants have injured all class members by failing to
> > meet their federal and state law obligations. Indeed, as
> > plaintiffs argue, the actions or inactions of defendants
> > are not isolated or discrete instances but, rather, form
> > a pattern of behavior that commonly affects all of the
> > proposed class members.
>
> The core issue presented by this appeal is whether, by
> conceptualizing the common legal and factual questions at this
> high level of abstraction (or, understood differently, by
> aggregating all of the plaintiffs' claims into one "super-
> claim"), the district court abused the discretion granted it by
> Rule 23 to provide for the orderly and efficient maintenance of
> this lawsuit. We find that the district court did not abuse its
> discretion by certifying this class at this time ....

Marisol A., 126 F.3d at 377. Here, too, plaintiffs are alleging that
defendants have failed to properly administer benefits due to systemic

errors and have, indeed, already adduced very substantial evidence that this is true.

Finally, Rule 23(a)(4) requires that plaintiffs demonstrate that "class counsel is qualified, experienced, and generally able to conduct the litigation" and that "there is no conflict of interest between the named plaintiffs and other members of the plaintiff class." Marisol A., 126 F.3d at 378. As to counsel, plaintiffs' counsel are experienced in class action litigation in both federal and state courts, including matters relating to public benefits, and their performance so far already has shown that they will prosecute this action vigorously and competently.

As for the individual class representatives, there is no indication of any conflict between the named plaintiffs and members of the class. Rather, the interests of the named plaintiffs are identical to those of the proposed class because the named plaintiffs seek declaratory and injunctive relief to assure that defendants conform their computer systems, policy directives, and worker training to the statutes and regulations governing immigrant eligibility so that class members will receive the benefits for which they are eligible. Such relief will have no detrimental effect on any of the other class members, but will only benefit them as it will increase their chances of obtaining benefits to which they are entitled.[21]  Thus, the proposed class satisfies the requirements of Rule 23(a)(4).

---

[21] Given the overall commonality of issues, the Court sees no need at this time to certify sub-classes, but will reconsider this possibility if the need arises later in this litigation.

Turning to Rule 23(b), the Court concludes that the proposed class falls within Rule 23(b)(2), which authorizes class actions where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2), Fed. R. Civ. P. "The (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 162 (2d Cir. 2001).

In this suit, plaintiffs are principally seeking injunctive relief to remedy what they allege are systemic deficiencies in defendants' administration of the statutes and regulations governing immigrant eligibility for benefits.  There is no need for any individualized assessment regarding the need for injunctive relief.  The Court of Appeals has affirmed the certification of a 23(b)(2) class under very similar circumstances: "Insofar as the deficiencies of the child welfare system stem from central and systemic failures, the district court did not abuse its discretion in certifying a 23(b)(2) class at this stage of the litigation."  Marisol A., 126 F.3d at 378; see also Comer v. Cisneros, 37 F.3d 775, 796 (2d Cir. 1994) (Rule 23(b)(2) satisfied "because the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" the class); Marisol A. by Forbes v. Giuliani, 929 F. Supp. 662, 692 (S.D.N.Y. 1996) (certifying 23(b)(2) class in case alleging systemic failures of New York City's child welfare system, and holding that "The instant case poses exactly the situation contemplated by Rule

-82-

23(b)(2). An order requiring defendants to comply with federal and state law in order to remedy the systemic failures that are the source of plaintiffs' claims constitutes relief that would serve the entire putative class."); Jeanine B. by Blondis v. Thompson, 877 F. Supp. 1268, 1288 (D. Wis. 1995) ("civil rights cases seeking broad declaratory or injunctive relief for a large and amorphous class . . . fall squarely into the category" of 23(b)(2) actions); Brown v. Giuliani, 158 F.R.D. 251, 269 (E.D.N.Y. 1994) ("Plaintiffs' complaint falls within Rule 23(b)(2). Defendants' failure to act is said to be institutional not merely a cumulation of individual cases. The final injunctive and declaratory relief requested here would inure to the benefit of all class members in gaining a timely processing of their applications for benefits."); Advisory Committee Note to Subdivision (b)(2) ("Illustrative are various actions . . . where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.")

For the foregoing reasons, the Court (i) grants plaintiffs' motion for preliminary injunctive relief by reconfirming the relief set forth in the Order of February 16, 2006, and adding to it each of the provisions set forth at pages 75-76 above; and (ii) grants plaintiffs' motion for class certification by certifying the class described at pages 77-78 above.   Counsel for the parties are hereby directed to jointly telephone Chambers no later than September 6, 2006 to schedule further proceedings in this case.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:  New York, New York
         August 29, 2006